IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 16-1509

EXODUS REFUGEE IMMIGRATION, INC.,

Plaintiff/Appellee,

v.

MICHAEL R. PENCE, in his official capacity as
Governor of the State of Indiana, *et al.*,

Defendants/Appellants.

On Appeal from the United States District Court for the
Southern District of Indiana, No. 1:15-cv-1858-TWP-DKL,
The Honorable Tanya Walton Pratt, Judge

**BRIEF AND REQUIRED SHORT APPENDIX OF
APPELLANTS GOVERNER MICHAEL R. PENCE AND
SECRETARY JOHN WERNERT, M.D.**

GREGORY F. ZOELLER
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

Office of the Attorney General          HEATHER HAGAN McVEIGH
IGC South, Fifth Floor                  LARA LANGENECKERT
302 W. Washington Street                JONATHAN R. SICHTERMANN
Indianapolis, IN 46204                  Deputy Attorneys General
(317) 232-6255
Tom.Fisher@atg.in.gov                   *Counsel for Defendants/Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 2

STATEMENT OF THE CASE ..................................................................... 3

I.      International Refugee Status and Resettlement ........................................... 4

        A.      The role of the United Nations ............................................. 4

        B.      The role of the United States government ........................................ 5

        C.      The role of the States and Indiana's State Refugee Plan .................. 7

II.     The Syrian Conflict and Refugee Crisis ........................................ 8

III.    Terrorism and Security Concerns  .............................................. 9

        A.      The Syrian conflict is attracting and producing terrorists ................ 9

        B.      Federal officials acknowledge terrorists are trying to infiltrate
                Western nations, including the United States, through the
                refugee resettlement process ............................................. 10

        C.      Terrorists have infiltrated the United States disguised as
                refugees ................................................................ 14

IV.     Governors and Congress Respond to the Security Risk ............................. 15

        A.      National response ........................................................ 15

        B.      Indiana's response ....................................................... 16

V.      The Resettlement Agencies' Response ........................................ 19

VI.     Procedural History .......................................................... 20

SUMMARY OF THE ARGUMENT ...................................................... 21

ARGUMENT .................................................................................. 26

I.    The Governor's Directive Does Not Violate Constitutional or Statutory Equal Protection Rights ................................................................ 26

    A.    The directive does not discriminate against national origin ........... 26

    B.    The Governor's directive is justified by a compelling interest in safeguarding the security of Indiana residents ............................. 32

    C.    The Governor's directive does not violate Title VI for the same reasons it does not violate the Equal Protection Clause ................. 35

II.    The Governor's Directive Is Not Preempted by the Constitution's Naturalization and Foreign Affairs Powers ................................................. 36

    A.    States' historic, fundamental, and compelling interest in protecting public safety rebuts constitutional preemption .............. 36

    B.    There is no Naturalization Clause preemption because the Governor is not regulating who may enter the United States or dictating terms for remaining in the United States ......................... 37

    C.    Suspending Refugee Act grants in no way implicates the Foreign Affairs Power ........................................................ 40

    D.    Anti-commandeering principles refute any exclusive constitutional powers preemption claims .......................................... 43

III.    The Governor's Directive is Not Preempted by the Refugee Act ............... 44

    A.    Exodus has no right of action to enforce Section 1522(a) of the Refugee Act, which in any event is directed at federal, rather than state, officials ................................................................. 44

    B.    The federal-state "consultation" required by the Refugee Act imposes requirements on federal officials; it does not restrict state officials from protecting public safety ...................................... 49

    C.    The Governor's directive is not preempted by statutory text directed to federal officials stating that "[a]ssistance and services funded under this section shall be provided to refugees without regard to . . . nationality" ...................................... 51

IV.    The District Court Erred in Finding That Irreparable Harm, the Balance of Harms, and the Public Interest Favor Injunctive Relief .......... 53

CONCLUSION ...................................................................................... 55

CERTIFICATE OF WORD COUNT ........................................................................ 56

CERTIFICATE OF SERVICE ................................................................................ 57

REQUIRED SHORT APPENDIX ........................................................................... 58

# TABLE OF AUTHORITIES

## CASES

*American Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003) ............................................................... 39, 42

*Arizona v. United States,*
   132 S. Ct. 2492 (2012) ........................................................... 39, 40

*Armstrong v. Exceptional Child Ctr., Inc.,*
   135 S. Ct. 1378 (2015) ...................................................... 24, 46, 47

*Bd. of Trs. of the Univ. of Ala. v. Garrett,*
   531 U.S. 356 (2001) ..................................................................... 43

*Caetano v. Massachusetts,*
   __ S. Ct. __ (Mar. 21, 2016), 2016 WL 1078932 ................................. 36

*Chamber of Commerce v. Whiting,*
   131 S. Ct. 1968 (2011) ................................................................. 50

*Chy Lung v. Freeman,*
   92 U.S. 275 (1875) ................................................................. 39, 40

*Ciechon v. City of Chicago,*
   634 F.2d 1055 (7th Cir. 1980) ....................................................... 53

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) ............................................................... 39, 42

*De Canas v. Bica,*
   424 U.S. 351 (1976) ..................................................................... 38

*Espinoza v. Farah Mfg. Co.,*
   414 U.S. 86 (1973) ....................................................................... 27

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ......................................................... 53

*Fernandez-Roque v. Smith,*
   734 F.2d 576 (11th Cir. 1984) ....................................................... 49

*Fla. Lime & Avocado Growers v. Paul,*
   373 U.S. 132 (1963) ..................................................................... 38

CASES [CONT'D]

*Frolova v. Union of Soviet Socialist Republics*,
    761 F.2d 370 (7th Cir. 1985) .................................................................. 41

*Garcia v. I.N.S.*,
    7 F.3d 1320 (7th Cir. 1993) ................................................................... 40

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824) ............................................................. 32, 36

*Graham v. Richardson*,
    403 U.S. 365 (1965) ............................................................................... 28

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ............................................................................... 35

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ................................................................................ 39

*Hirabayashi v. United States*,
    320 U.S. 81 (1943) .......................................................................... 27, 28

*Ill. Bell Tel. Co. v. Worldcom Techs, Inc.*,
    157 F.3d 500 (7th Cir. 1998) ................................................................. 54

*Keller v. City of Fremont*,
    719 F.3d 931 (8th Cir. 2013) ................................................................. 38

*Korematsu v. United States*,
    323 U.S. 214 (1944) ............................................................................... 28

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ............................................................................... 54

*Medellin v. Texas*,
    552 U.S. 491 (2008) .......................................................................... 40, 41

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ............................................................................... 36

*New York v. United States*,
    505 U.S. 144 (1992) .......................................................................... 43, 44

*NFIB v. Sebelius*,
    132 S. Ct. 2566 (2012) ..................................................................... 43, 44

CASES [CONT'D]

*Oyama v. California,*
    332 U.S. 633 (1948) ............................................................ 27, 28, 29

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ............................................................... 51

*Printz v. United States,*
    521 U.S. 898 (1997) ............................................................ 43, 44, 50

*Regents of Univ. of Cal. v. Bakke,*
    438 U.S. 265 (1978) ............................................................ 26, 27, 35

*Signode Corp. v. Weld-Loc Sys., Inc.,*
    700 F.2d 1108 (7th Cir. 1983) ................................................. 54

*Smith v. Turner,*
    48 U.S. (7 How.) 283 (1849) ................................................... 36

*Stewart v. Taylor,*
    104 F.3d 965 (7th Cir. 1997) .................................................. 54

*Toll v. Moreno,*
    458 U.S. 1 (1982) ............................................................. 44

*United States v. Pink,*
    315 U.S. 203 (1942) ........................................................... 41, 44

*United States v. Rural Elec. Convenience Co-op. Co.,*
    922 F.2d 429 (7th Cir. 1991) .................................................. 54

*Walgreen Co. v. Sara Creek Prop. Co.,*
    966 F.2d 273 (7th Cir. 1992) .................................................. 53

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................. 54, 55

STATUTES

8 U.S.C. § 1101(a)(42)(A) ........................................................ 6

8 U.S.C. § 1157 .................................................................. 5

8 U.S.C. § 1253(h) (1976 ed.) .................................................... 41

8 U.S.C. § 1521 .................................................................. 5

Statutes [cont'd]

8 U.S.C. § 1522................................................................................ 7, 50, 51

8 U.S.C. § 1522(a) ...................................................................................*passim*

8 U.S.C. § 1522(a)(2)(A) .................................................................. 45, 49

8 U.S.C. § 1522(a)(2)(B) .................................................................. 45, 49

8 U.S.C. § 1522(a)(2) (C) ....................................................................... 45

8 U.S.C. § 1522(a)(2)(D) ........................................................................ 49

8 U.S.C. § 1522(a)(5) ................................................................. 45, 47, 49, 51

8 U.S.C. § 1522(a)(6) ............................................................................. 46

8 U.S.C. § 1522(a)(6)(A) ........................................................................ 8

8 U.S.C. § 1522(a)(7) ............................................................................. 46

8 U.S.C. § 1522(a)(8) ............................................................................. 46

8 U.S.C. § 1522(e)(7) ......................................................................... 7, 42

18 U.S.C. § 1385................................................................................... 37

28 U.S.C. § 1292(a)(1) ............................................................................ 1

28 U.S.C. § 1331.................................................................................... 1

28 U.S.C. § 1343.................................................................................... 1

42 U.S.C. § 1983................................................................................. 1, 44

42 U.S.C. § 2000d............................................................................... 1, 21

42 U.S.C. § 5170................................................................................... 37

Ind. Code § 34-13-1-1 .......................................................................... 53

United States Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ....................... 5

Regulations

45 C.F.R. § 400.2 ................................................................................... 6

**REGULATIONS [CONT'D]**

45 C.F.R. § 400.4 ................................................................................ 8

45 C.F.R. § 400.5 ...................................................................... 8, 46, 51

45 C.F.R. § 400.11(a) ........................................................................ 8

45 C.F.R. § 400.11(d) ........................................................................ 8

45 C.F.R. § 400.11(e) ........................................................................ 8

45 C.F.R. § 400.11(e)(2) .................................................................. 8

45 C.F.R. § 400.69 ...................................................................... 7, 42

**CONSTITUTIONAL PROVISIONS**

Ind. Const. art. 5, § 12 .................................................................. 37

U.S. Const. art. I, § 8, cl. 4 ............................................................ 44

U.S. Const. art. I, § 10 .................................................................. 37

U.S. Const. art. IV, § 4 ............................................................ 36, 37

**OTHER AUTHORITIES**

161 Cong. Rec. H9054 (daily ed. Dec. 8, 2015) .......................... 12

Homeland Security Committee, *#Terror Gone Viral: Overview of the 75
    ISIS-Linked Plots Against the West, 2014–2016* (March 2016), *available
    at* https://homeland.house.gov/wp-content/uploads/2016/03/Report-
    Terror-Gone-Viral-1.pdf ............................................................ 13

Khetam Malkawi, *First Syrians Arrive in US Under Surge Resettlement
    Program*, AP: The Big Story (Apr. 7, 2016), http://bigstory.ap.org/
    article/7541e848938d43f0b2051cc215426b3a/first-syrians-leave-us-
    under-surge-resettlement-program .............................................. 9, 33

Paul Cruickshank and Tim Lister, *The Mysterious 'Syrian' Thought to Be
    at the Heart of the ISIS Attacks in Europe*, CNN.com (Mar. 25, 2016) ............... 12

Polly J. Price, *Sovereignty, Citizenship, and Public Health in the United
    States*, 17 N.Y.U. J. Legis. & Pub. Pol'y 919 (2014) ...................... 31, 36

**OTHER AUTHORITIES [CONT'D]**

U.S. Senate Roll Call Votes 114th Congress – 2nd Session, Vote Summary
for the Motion to Invoke Cloture on the Motion to Proceed to H.R. 4038,
http://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.
cfm?congress=114&session=2&vote=00004 (last visited Apr. 10, 2016) ............ 16

## JURISDICTIONAL STATEMENT

Plaintiff/Appellee Exodus Refugee Immigration, Inc. ("Exodus") filed this action pursuant to 42 U.S.C. § 1983, seeking a declaration that Indiana Governor Mike Pence's decision temporarily to suspend payment of claims by non-profit agencies for services to refugees fleeing Syria is preempted by the United States Constitution and other federal law, and violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. ECF No. 1 at 1–2. Exodus also sought a preliminary injunction, later to be made permanent, against Defendants/Appellants Governor Michael R. Pence and Secretary of the Indiana Family and Social Services Administration John Wernert, M.D. ("the State") in their official capacities. *Id*. at 12. Exodus is an Indiana non-profit corporation with its principal place of business in Marion County, Indiana. *Id*. at 2. The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1). The district court issued an Order Granting Plaintiff's Motion for Preliminary Injunction on February 29, 2016. Appellants' Required Short Appendix ("Short App.") 35. No motion for a new trial or alteration of the judgment or any other motion tolling the time within which to appeal was filed. The State filed a timely notice of appeal on March 8, 2016. District Court Electronic Filing Number ("ECF No.") 72. This is not an appeal from a decision of a magistrate judge.

## STATEMENT OF THE ISSUES

When international refugees make their way to the United States, private agencies decide, based on many factors including the refugees' native languages and countries of origin, where to resettle them.   The State of Indiana voluntarily participates in a program under the Refugee Act that awards federally funded grants to resettlement agencies for providing services to refugees.   In November 2015, authorities discovered that Islamic jihadists responsible for the Paris terrorist bombings had travelled as refugees on Syrian passports.   Also in fall 2015, senior federal officials, including the Secretary of Homeland Security, the Director of the FBI, and the Director of the FBI's Counterterrorism Division, testified before Congress that the United States systematically lacked background information about refugees fleeing Syria.   In the view of Indiana Governor Mike Pence, that testimony, coupled with reports that Islamic jihadists had already been posing as Syrian refugees, carried grave public safety implications.   Accordingly, on November 16, 2015, Governor Pence directed state agencies not to award Refugee Act resettlement grants for services provided to refugees fleeing Syria, with the intention of deterring resettlement of such refugees in Indiana.

The questions presented for review are:

1.     May a State, consistent with the equal protection guarantees of the Fourteenth Amendment and Title VI, refuse to award grant monies for services provided to any refugees coming from Syria, regardless of their race, ethnicity, ancestry, nationality or national origin?

2.     When a State chooses to participate in a Refugee Act grant program, may the State suspend grant awards without being preempted by the Constitution's naturalization and foreign affairs powers?

3.     May a State, on account of public safety concerns, refuse to award Refugee Act grants for services provided to refugees coming from Syria, regardless of race, nationality, or citizenship, without being preempted by the Refugee Act?

## STATEMENT OF THE CASE

This case is about Governor Pence's authority to fulfill his core responsibility to protect the safety of Indiana residents by taking limited and temporary action concerning refugees of any nationality fleeing Syria who may be resettled in Indiana by private agencies.  On November 16, 2015, the Governor signed a directive instructing the Secretary of the Indiana Family and Social Services Administration to suspend payment of claims by non-profit agencies for resettlement services provided to such refugees.  The Governor's temporary suspension of payments to refugee resettlement agencies followed congressional testimony by senior federal law enforcement officials—including Secretary of Homeland Security Jeh Johnson, FBI Director James Comey, and FBI Counterterrorism Director Michael Steinbach—that, owing to the situation in Syria, the United States systematically lacks information concerning the backgrounds of refugees fleeing Syria.

Governor Pence signed his November 16 directive in response both to this testimony and to mounting evidence that Islamic jihadists, including those

associated with the terrorist organization known as the Islamic State in Syria and Iraq may have the intention and ability to attack Western countries by posing as Syrian refugees. The directive fits within a larger program relating to refugee resettlement.

## I.    International Refugee Status and Resettlement

### A.    The role of the United Nations

The 1951 Convention Relating to the Status of Refugees, as amended by the 1967 Protocol Relating to the Status of Refugees, is "the core instrument of international refugee law." ECF No. 41-2 at 12. It defines "refugee" as a person who "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable, or owing to such fear, is unwilling to avail himself of the protection of that country;" *id.* at 18 (emphasis added), or a person who, "not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it." *Id.* (emphasis added). Refugees have no automatic right to resettlement, and UN member nations have no obligation to accept refugees for resettlement. *Id.* at 36. Twenty-five UN member nations, including the United States, currently accept refugees. *Id.* at 65–66.

For each refugee, the Office of the UN High Commissioner for Refugees (UNHCR), the international agency charged with protecting refugees, prepares an informational dossier to submit to resettlement member nations. *Id.* at 335–36.

The dossier contains biographical information, including each refugee's name, sex, date of birth, marital status, country of origin, citizenship, place and country of birth, and place of habitual residence.  *Id*. at 338, 340.  Copies of all relevant and available documents are included:  identification documents from the country of origin or asylum, marriage certificates or divorce papers, custody documents, and medical reports.  *Id*. at 348.  The dossier provides "a comprehensive outline of the refugee claim," including "a summary of the accepted facts that are directly related to the [refugee's] fear of persecution."  *Id*. at 340.  UNHCR staff identify a suitable resettlement country and submit the dossier to that country.  *Id*. at 353–57.

> ### B.     The role of the United States government

The entry of foreign national refugees into the United States is governed by the federal Immigration and Nationality Act, 8 U.S.C. ch. 12, as amended by the United States Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.  The President makes an annual determination of how many refugees may be admitted in the upcoming fiscal year from each of the various countries and regions of the world.  8 U.S.C. § 1157.

The Act also established the Office of Refugee Resettlement (ORR) within the Department of Health and Human Services and charged it with funding and administering various federal programs related to resettlement.  8 U.S.C. § 1521. Within the State Department, the Bureau of Population, Refugees, and Migration (PRM) is responsible for coordinating refugee policy.

The Act defines "refugee" similarly to the 1951 Convention.  To qualify as a "refugee" under U.S. law, a person must be (1) located outside the person's country of citizenship, or, in the case of a stateless person, the country where the person most recently lived, and (2) "unable or unwilling to return to, and . . . unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).

PRM receives refugee applications at nine Resettlement Support Centers located around the world.  ECF No. 41-3.  These Centers are funded and managed by PRM, but operated by international nongovernmental organizations.  *Id.*  For each refugee seeking protection in the United States, a Center gathers biographic and other information, including the refugee's country of origin, which is the country the refugee is fleeing (*i.e.*, the country of most recent residence, whose protection the refugee is "unable or unwilling to avail himself or herself of," 8 U.S.C. § 1101(a)(42)(A)).  *See* ECF No. 41-3.

Officers from the Department of Homeland Security's U.S. Citizenship and Immigration Services (USCIS) review this information and conduct an in-person interview with the applicant.  *Id.*  If an officer approves the applicant for resettlement and the applicant passes a health screening, the Center locates a U.S.-based "Voluntary Agency" willing to provide "sponsorship assurance" and determine where the applicant will resettle in the United States.  *Id.*; 45 C.F.R. § 400.2.

6

Sponsorship assurance confirms that a Voluntary Agency is "willing and prepared to accept the case for resettlement, and that all necessary arrangements will be made at the local level to receive the refugee." ECF No. 41-4. The Center coordinates refugee travel arrangements with the Voluntary Agency. *Id*.

### C.     The role of the States and Indiana's State Refugee Plan

Once a Voluntary Agency accepts a refugee for resettlement in the United States, it notifies an affiliated local resettlement agency. Plaintiff Exodus Refugee Immigration, Inc., an independent nonprofit based in Indianapolis, is one such resettlement agency. ECF No. 1 at 2. Exodus is part of a network of affiliates working with Church World Service Immigration and Refugee Program and Episcopal Migration Ministries—both of which are Voluntary Agencies that work with PRM—to resettle of refugees. ECF No. 16 at 9–10. Once it receives a refugee case, Exodus works with community organizations, faith-based groups and others to facilitate resettlement. ECF No. 41-5 at 3.

Exodus and other local resettlement agencies are eligible for government grants under the Refugee Act for services to refugees. *See generally* 8 U.S.C. § 1522. Typically, States administer these grants, although not all States choose to participate in the program. There is a separate federal grant program, known as Wilson-Fish, that awards grants to private entities who resettle refugees in the twelve States that currently do not participate in the Refugee Act. 8 U.S.C. § 1522(e)(7); 45 C.F.R. § 400.69; ECF Nos. 41-38, 41-44.

Participating Refugee Act States submit a State Plan outlining allocation of public and private resources for refugees' housing, language training, and employment assistance.   8  U.S.C.  § 1522(a)(6)(A);  45  C.F.R.  §§  400.4,  400.5. Participating States may receive two types of quarterly federal grants:  (1) grants for refugee social services (*i.e.*, citizenship and naturalization preparation services and assistance in obtaining employment authorization documents); and (2) grants for cash assistance, medical assistance, and related administrative costs.  45 C.F.R. § 400.11(a).  The Office of Refugee Resettlement approves quarterly grant awards. 45 C.F.R. § 400.11(d)–(e).  The State draws approved funds as needed through the Department of Health and Human Services' Payment Management System.   45 C.F.R. § 400.11(e)(2).

Indiana has a State Plan for refugee resettlement.  App. 37–63.  The Indiana Family and Social Services Administration Division of Family Resources administers the State Plan.  *Id.* at 38–39.  Assistance under the State Plan includes grants to resettlement agencies for social services, which the Governor's directive affects, and cash assistance, medical assistance, education assistance, and other federal entitlements, which the directive does not affect.  *Id.* at 15–16, 30–32.

## II.     **The Syrian Conflict and Refugee Crisis**

In March 2011, a series of antigovernment protests—inspired by a wave of similar "Arab Spring" demonstrations across the Middle East and North Africa— erupted in Syria's southern province of Dar'a.  ECF Nos. 41-7, 41-8.  The Syrian government, led by President Bashar al-Assad, responded with armed force, which

led to formation of opposing militias. *Id.* By 2012, the conflict had expanded into a full-fledged civil war. *Id.*

To date, "the conflict has displaced 11.6 million people, including 7.6 million people internally, making the situation in Syria the largest humanitarian crisis worldwide." ECF No. 41-8. More than half a million Syrian refugees currently seek resettlement in Western nations, including the United States. ECF No. 41-9 at 2. In FY2015, the United States received nearly 1,700 refugees from Syria. ECF No. 41-10 at 2.

In September 2015, the President announced that the United States would admit at least 10,000 Syrian refugees in FY2016. *Id.* To meet this target, the United States has implemented a "speeded-up 'surge operation.'" Khetam Malkawi, *First Syrians Arrive in US Under Surge Resettlement Program*, AP: The Big Story (Apr. 7, 2016), http://bigstory.ap.org/article/7541e848938d43f0b2051cc215426b3a/first-syrians-leave-us-under-surge-resettlement-program. The regional refugee coordinator at the U.S. Embassy in Amman explained that "[w]hile the resettlement process usually takes 18 to 24 months, the surge operation will reduce the time to three months[.]" *Id.*

## III.    Terrorism and Security Concerns

### A.    The Syrian conflict is attracting and producing terrorists

According to the U.S. Department of State, "[t]he ongoing civil war in Syria was a significant factor in driving worldwide terrorism events in 2014." ECF No. 41-11 at 7. As of late December 2014, more than 16,000 foreign terrorist fighters

9

had traveled to Syria–more than the number that "traveled to Afghanistan and Pakistan, Iraq, Yemen, or Somalia at any point in the last 20 years." *Id.* Many joined the Islamic State's effort to "seize contiguous territory in western Iraq and eastern Syria for a self-declared Islamic caliphate." *Id.*

Counterterrorism experts have expressed particular concern over "the growing number of [Islamic] extremists . . . that have traveled to (and from) Syria and Iraq to fight." ECF No. 41-12 at 4. According to a recent report, a number of attacks and terrorist plots across the West have had operational ties to (or were inspired by) the Islamic State in Syria. ECF No. 41-13 at ix. "ISIS-related mobilization in the United States has been unprecedented[,]" the report notes. *Id.*

## B. Federal officials acknowledge terrorists are trying to infiltrate Western nations, including the United States, through the refugee resettlement process

The refugee resettlement process is susceptible to manipulation, as even PRM has acknowledged. In 2011, PRM instructed reception and placement agencies to notify the State Department and the Department of Homeland Security of any "anomalies in the program" in order "to ensure that . . . imposters are not posing as refugees to seek admission . . . ." ECF No. 41-14.

The extensive connections between the Syrian crisis and terrorist activities prompted members of Congress to investigate the screening process for refugees entering the United States. In September 2015, the Homeland Security Committee of the U.S. House of Representatives Task Force on Combatting Terrorism and Foreign Fighter Travel found that "[m]embers of terrorist groups like ISIS have publicly bragged they are working to sneak operatives into the West posing as

refugees, and European officials are worried this is already the case."  ECF No. 41-15 at 43.

What is more, a recent Homeland Security Investigations Intelligence Report, reportedly states that "ISIS likely has been able to print legitimate-looking Syrian passports since taking over the city of Deir ez-Zour last summer, home to a passport office with 'boxes of blank passports' and a passport printing machine."  ECF No. 41-16.  Another passport office was located in Raqqa, Syria, which is the Islamic State's de facto capital.  *Id*.  ABC News quotes the report as stating that "[s]ince more than 17 months [have] passed since Raqqa and Deir ez-Zour fell to ISIS, it is possible that individuals from Syria with passports 'issued' in these ISIS controlled cities or who had passport blanks, may have traveled to the U.S."  *Id*. (alteration in original).

Further complicating matters, according to the Department of Homeland Security, the "near-absence of communication" between Western nations and the Syrian government means that the United States and European countries "are lacking key information that could be used to identify the passports."  ECF No. 41-17.  A former U.K. counterterrorism official estimated that Islamic State "can probably make [fake passports] good enough to get them past someone who has faced 10,000 refugees."  *Id*.  There are reports of YouTube videos "showing people how to obtain Syrian passports and impersonate Syrians."  *Id*.

One of the terrorists involved in the Paris attacks was registered as a refugee in Greece, and Belgian officials arrested another man who entered Europe as a

refugee with a fake Syrian passport.  *Id.*  One suspect in the March 22 Brussels attack "is thought to have arrived on the Greek island of Leros amid hundreds of refugees arriving from Syria, Iraq and elsewhere."  Paul Cruickshank and Tim Lister, *The Mysterious 'Syrian' Thought to Be at the Heart of the ISIS Attacks in Europe*, CNN.com (Mar. 25, 2016), http://www.cnn.com/2016/03/25/europe/mysterious-syrian-terror-attacks/.  Belgian counterterrorism officials have also revealed that Islamic State gained control of the materials needed to make Iraqi passports when it occupied Mosul.  ECF No. 41-17.

In November 2015, the U.S. House of Representatives Homeland Security Committee verified that Islamic State and other terrorists "are determined" to abuse refugee programs and "focused on deploying operatives to the West."  ECF No. 41-9 at 2, 3.  And Congressman Michael McCaul, Chairman of the U.S. House of Representatives Homeland Security Committee, recently confirmed that the "National Counterterrorism Center has identified 'individuals with ties to terrorist groups in Syria attempting to gain entry to the U.S. through the U.S. refugee program.'"  161 Cong. Rec. H9054 (daily ed. Dec. 8, 2015) (statement of Rep. McCaul).  Representative McCaul expressed concern "that serious intelligence gaps preclude us from conducting comprehensive screening to detect all Syrian refugees with terrorist ties[.]"  *Id.*

Even more important for this case, current Obama Administration officials have also expressed concern over gaps in the vetting process of refugees fleeing Syria.  These concerns arise largely from a systematic lack of reliable intelligence on

the war-torn region.   Michael Steinbach, Assistant Director of the FBI's Counterterrorism Division, explained his "concern is in Syria, the lack of our footprint on the ground in Syria, that the databases won't have the information we need.  So, it is not that we have a lack of process, it is there is a lack of information." ECF No. 41-18 at 46.  Confirming the importance of Steinbach's observation, FBI Director James Comey testified, "we can query our databases until the cows come home but nothing will show up because we have no record of that person." Appellants' Appendix ("App.") 98.  Homeland Security Secretary Jeh Johnson has explained that "[w]e do have to be concerned about the possibility that a terrorist organization may seek to exploit our refugee resettlement process," ECF No. 41-20 at 1, and Director of National Intelligence James Clapper lamented, "[w]e don't obviously put it past the likes of ISIL to infiltrate operatives among these refugees." App. 98.

More recently, a report of the U.S. House of Representatives Homeland Security Committee quotes Clapper saying that Islamic State is "taking advantage of the torrent of migrants to insert operatives into that flow" and that the group is "pretty skilled at phony passports so they can travel ostensibly as legitimate travelers."  Homeland Security Committee, *#Terror Gone Viral: Overview of the 75 ISIS-Linked Plots Against the West, 2014–2016*, at 7 (March 2016), *available at* https://homeland.house.gov/wp-content/uploads/2016/03/Report-Terror-Gone-Viral-1.pdf (internal quotations omitted).

13

**C.     Terrorists have infiltrated the United States disguised as refugees**

Two recent arrests in the U.S. demonstrate that these are not merely hypothetical concerns.  In January, two Iraqi-born men who came to the U.S. as refugees (one from Syria) were arrested on terrorism-related charges.   Aws Mohammed Younis Al-Jayab, who came to the U.S. as a refugee from Syria in 2012, is accused of making false representations to federal officials regarding his travel to Syria to support terrorist activities.  ECF No. 41-21 at 1, 2.  Omar Faraj Saeed Al Hardan, who came to the U.S. as a refugee from Iraq in 2009, is accused of "provid[ing] material support and resources . . . including personnel, specifically himself, training, and expert advice and assistance, to a foreign terrorist organization, namely, the Islamic State of Iraq and the Levant ('ISIL')[.]"  ECF No. 41-22 at 3, 4.  While these arrestees are presumed innocent, and while there is no allegation they were planning attacks in the United States, their indictments nonetheless show the federal government believes these alleged Islamic jihadists exploited the refugee program to gain entrance to the United States, or at least entered the United States as refugees.

Moreover, federal law enforcement has previously linked purported refugees to terrorist plots in the United States.  In 2011, USCIS apparently altered its treatment of Iraqi refugee cases—resulting in a marked decline in the number of Iraqi refugees admitted to the United States—when officials discovered that at least two al Qaeda terrorists from Iraq had been resettled in the United States after

claiming refugee status.  ECF Nos. 41-23, 41-24 (showing a nearly 50 percent drop in Iraqi refugee admissions between FY2010 and FY2011).

Meanwhile, Islamic jihadists posing as Syrian refugees have successfully carried out terrorism elsewhere.  Recently, an Islamic State suicide bomber posing as a Syrian refugee carried out an attack in Istanbul, killing at least ten and injuring several others.  ECF No. 41-25.  Also, in December 2015, two men who entered Europe using forged Syrian passports were arrested at a refugee center in Austria on suspicion of abetting the November terrorist attacks in Paris.  ECF No. 41-26.  Late last year, Honduran authorities arrested five Syrian nationals attempting to travel to the United States using stolen Greek passports.  ECF No. 41-27.  Similar reports come from St. Maarten and Paraguay.  ECF No. 41-28.

## IV.  Governors and Congress Respond to the Security Risk

### A.  National response

In the aftermath of the Paris attacks and the discovery of the connection to Syrian refugees, many U.S. Governors began to announce their opposition to resettling Syrian refugees in their States.  *See, e.g.*, ECF No. 41-29 (Letter from Florida Governor Rick Scott to Speaker Paul Ryan, stating Florida's Department of Children and Families would "not support the requests" it had received to "support the relocation of 425 possible Syrian refugees to Florida"); ECF No. 41-30 (Letter from the Governors of 27 States to President Obama requesting that the President "suspend all plans to resettle additional Syrian refugees" until "an exhaustive review of all security measures has been completed and the necessary changes have been implemented").

15

In Texas and Alabama, officials filed lawsuits seeking to enjoin the federal government from resettling refugees in those States.  ECF Nos. 41-31, 41-32.  Both lawsuits are still pending in federal district court.

The U.S. House of Representatives also acted quickly in response to the security threat.  On November 17, 2015, U.S. Representative Michael McCaul of Texas introduced the American Security Against Foreign Enemies (SAFE) Act.  ECF No. 41-33, H.R. 4038, 114th Cong. (2015). The Act would ensure that no refugee from Iraq or Syria is admitted into the United States unless (1) the Director of the FBI certifies the refugee's background investigation and (2) the Secretary of Homeland Security, along with the FBI Director and the Director of National Intelligence, certifies to Congress that the refugee is not a security threat.  *Id*. § 2(a)–(b).  It also would require the DHS Inspector General to assess refugee approvals independently and report to Congress.  *Id*. § 2(c).  On November 19, just two days after its introduction, the Act passed in the House, only to die in a Senate cloture vote, by a narrow margin of 55-43.   U.S. Senate Roll Call Votes 114th Congress – 2nd Session, Vote Summary for the Motion to Invoke Cloture on the Motion to Proceed to H.R. 4038, http://www.senate.gov/legislative/LIS/roll_call_lists/ roll_call_vote_cfm. cfm?congress=114&session=2&vote=00004 (last visited Apr. 10, 2016).

### B.     Indiana's response

On November 16, 2015, Indiana Governor Mike Pence announced:  "In the wake of the horrific attacks in Paris, effective immediately, I am directing all state

agencies to suspend the resettlement of additional Syrian refugees in the state of Indiana pending assurances from the federal government that proper security measures have been achieved."  ECF No. 41-34.  He continued:  "Unless and until the state of Indiana receives assurances that proper security measures are in place, this policy will remain in full force and effect."  *Id.*

In conjunction with that statement, Governor Pence directed FSSA and all executive branch agencies "to suspend all activities in any manner processing or facilitating the resettlement of additional Syrian refugees" to Indiana until the FBI "and other federal and state security organizations" could demonstrate to the Governor and the Indiana Department of Homeland Security that resettlement "will not jeopardize the safety or security of those in Indiana."  App. 19.

A few days later, Governor Pence and twenty-six other Governors wrote a letter to President Obama asking him to "immediately review the process by which you conduct background checks on all individuals applying for refugee status and address the gaps acknowledged by your director of the FBI."  ECF No. 41-30.  They asked that until the completion of that review and the implementation of any necessary changes, the President "suspend all plans to resettle additional Syrian refugees."  *Id.*

Next, Governor Pence wrote a letter to Indiana's congressional delegation advising it of his actions and clarifying several points.  ECF No. 41-35.  He first noted that his order was applicable only to refugees fleeing Syria: "The State of Indiana continues to welcome refugees from other countries around the world and

has done so in recent days." *Id*. at 2.  He added also that he had not imposed a permanent halt but rather "a suspension of participation that we look forward to lifting once the federal government can make proper assurances to the state regarding the security of the program and addressing the concerns raised by federal officials." *Id*.  Finally, he urged the delegation to act "to pause the Syrian refugee program and enact legislation that will address the safety and security concerns so that we can renew our participation[,]" noting that "any legislation that is passed must directly address the concerns raised about the Syrian refugee program so that going forward the citizens of our state and the country can be confident that it will not be abused by ISIS to bring harm to America." *Id*. at 2–3.

In practical effect, the Governor's directive means that, during its pendency, Indiana state agencies will not pay grant monies to local resettlement agencies on account of social services they have provided to refugees fleeing Syria.  App. 15. However, during the pendency of the Governor's directive, refugees fleeing Syria who are resettled in Indiana and otherwise eligible for cash assistance or other government programs, including but not limited to TANF, SNAP and Medicaid, will not be denied benefits on account of the fact they are fleeing Syria.  *Id*. at 15–16.  In addition, during the pendency of the Governor's directive, Indiana will continue to use federal refugee resettlement grant funds to pay claims for initial health screenings and treatments that county health departments provide for refugees fleeing Syria, health promotion activities for such refugees, and assistance to schools that provide English language instruction to refugee children.  *Id*. at 15.

18

Initially, the State applied the Governor's directive to all refugees whose "country of origin" is Syria, concluding this was "the best way to achieve the directive's purpose of discouraging the resettlement of potentially dangerous individual who might come to Indiana posing as Syrian refugees." App. 101.  In its Statement of Interest filed in the district court, however, the United States noted that not all refugees fleeing Syria would be designated as refugees of Syrian "origin."  For example, "[a]n Iraqi national who fled from Syria to Turkey and was unable to safely return to Iraq might qualify as a refugee, but, if so, his 'country of origin' would be designated as Iraq, not Syria."  ECF No. 58 at 13.

Accordingly, because what prompts Indiana's security concerns is a refugee's *experience in Syria*—about which the federal government has little information—not the refugee's *ethnicity or citizenship or other technical "nationality*," the State clarified that it would seek to apply the Governor's directive to all refugees who had recently been in Syria, regardless of the "country of origin" listed on their refugee forms.  App. 101; ECF No. 64 at 9.

## V.    The Resettlement Agencies' Response

Three non-profit resettlement agencies operate in Indiana: Exodus Refugee Immigration, Inc., Catholic Charities of Indianapolis, and Catholic Charities of Fort Wayne.  Neither of the Catholic Charities agencies are parties to this case.  The day after the Governor issued his directive, FSSA sent a letter to the two Indianapolis-based resettlement agencies (who were most likely to resettle Syrian refugees)

advising them of the directive and asking them to suspend Syrian refugee resettlement efforts in Indiana.  App. 24, 26.

For its part, the Roman Catholic Archdiocese of Indiana met with the Governor regarding a family fleeing Syria it intended to resettle in the State. Archbishop Joseph Tobin refused the Governor's request that the Archdiocese suspend the resettlement, and the family arrived in Indianapolis on December 7, 2015.  ECF No. 41-36.

Initially, Exodus deferred to the Governor's directive and arranged for a family of refugees fleeing Syria to resettle in Connecticut rather than Indiana.  ECF No. 1 at 9–10.  Later, however, it decided that it would accept refugees fleeing Syria for resettlement in Indiana, even if the State would reject its claims for Refugee Act grants for those refugees.  *Id.* at 10–11; ECF No. 16 at 11–12.

Indeed, in January 2016, Exodus resettled in Indiana a family of four refugees who fled Syria.  App. 101.  A month later, following the preliminary injunction hearing in this matter, Exodus notified the State that it had enrolled the family on a separate federal matching grant program.  *Id.*  Because the refugees would be receiving assistance by way of the matching grants, Exodus represented to the State that it would not submit any reimbursement claims to the State for social services rendered to the four new refugees.  *Id.*

## VI.    Procedural History

On November 23, 2015, Exodus filed a complaint in the Southern District of Indiana seeking a declaration that the Governor's directive is preempted by the

United States Constitution and other federal law, and violates the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.  ECF No. 1 at 1–2.  Exodus also filed a motion for preliminary injunction.  ECF No. 6.  The parties took discovery and briefed Exodus's preliminary injunction motion.  *See* ECF Nos. 16, 41, 46, 64.

On February 29, 2016, the district court granted Exodus's motion.  Short App. 35.  In the district court's view, the Governor's directive discriminates based on national origin and, is not narrowly tailored to serve an assumed compelling state interest in protecting public safety.  *Id*. at 19–27.  The district court also found the other preliminary injunction factors favor Exodus, and enjoined "the State from taking any actions to interfere with or attempt to deter the resettlement of Syrian refugees by Exodus in the State of Indiana, including by withholding from Exodus funds and services due Exodus and the refugees it serves."  *Id*. at 35.

On March 8, 2016, the State filed its Notice of Appeal along with a Motion for Stay Pending Appeal.  ECF Nos. 72, 74.  The district court denied the State's Motion on March 29, 2016.  App. 11.

### SUMMARY OF THE ARGUMENT

1.     The Governor issued his directive to protect the public from a well-documented threat:  Islamic jihadists posing as refugees from Syria.  The directive is a limited, temporary measure designed to deter the resettlement in Indiana of refugees whose backgrounds, according to senior federal officials, cannot be properly vetted.  It applies to all refugees coming from Syria, regardless of their race,

ethnicity, ancestry, nationality, or national origin. The Equal Protection Clause makes national origin a suspect classification only as a proxy for race or ethnicity, but the directive targets only the highly relevant experience of Syrian residence, not immutable characteristics like race and ethnicity that are irrelevant to security.

Even if the Governor's directive must be narrowly tailored to serve a compelling government interest, it survives this test as well. The directive is justified by the State's compelling interest in protecting its residents from the well-documented threat of terrorists posing as refugees to gain entry into Western countries. Congressional testimony by senior federal officials, including the Secretary of Homeland Security, the Director of the FBI, and the Assistant Director for Counterterrorism of the FBI, establish that federal authorities lack background information about refugees coming out of Syria. Furthermore, multiple public reports substantiate that Islamic State terrorists already have infiltrated Syrian refugee populations. The Governor is not required to turn a blind eye to the growing threat of terrorism from Islamic jihadists who seek to exploit our generosity toward refugees.

The district court concluded that, compelling interest in public security notwithstanding, the Governor's directive is not narrowly tailored because it is ineffective; Exodus has continued to resettle Syrian refugees in Indiana. Evaluating the efficacy of the directive based on Exodus's ability to use alternative matching funds to resettle a relative handful of Syrian refugees in three months is shortsighted. The whole reason Exodus brought this lawsuit is that, without

payment of Refugee Act grants, it cannot sustain services to Syrian refugees over the long term.  The Governor is not targeting the refugees themselves, who have little control over where they are resettled.  He is instead targeting the resettlement agencies and their affiliated national voluntary associations, who do make those decisions.  The Governor's directive is likely to deter those private agencies from resettling refugees fleeing Syria in Indiana by removing the financial incentives for doing so.  Indeed, if the Governor's directive were truly off target, Exodus would lack standing to sue.

2.     The district court did not squarely address Exodus's preemption arguments, but presumably Exodus will continue to pursue them in this Court. Exodus's first preemption argument has been that, though the State voluntarily participates in the Refugee Act grant program, the Governor's decision to suspend that participation (in part) is somehow preempted by the Naturalization Clause and the plenary Foreign Affairs Power.  This argument is hardly plausible, as it proceeds from the startling assumption that Indiana is required by the Constitution to distribute these grants.  Twelve States refuse to participate in the Refugee Act grant program entirely, yet surely no one argues *their* choice is preempted by the Naturalization and Foreign Affairs powers.  And just as the Tenth Amendment protects States from having to do federal bidding in other areas, so too it negates any suggestion that the Constitution requires States to participate in federal grant programs.  Any preemption related to a State's participation in a federal grant

program must come from the statutes creating the program, not directly from the Constitution.

In that regard, however, Exodus's Refugee Act preemption theory also runs aground.  First, the Supreme Court's decision in *Armstrong* precludes equitable private enforcement of a federal statute where federal agency enforcement is available.  Critically, Exodus has urged that the Refugee Act's rule against "nationality" discrimination forbids suspension of grant payments based on legitimate security questions when the scope of those questions is defined by reference to a particular nation-state.  Yet any such understanding of "nationality" discrimination would also bind the United States, both under the Refugee Act and the United Nations Convention Relating to the Status of Refugees.  Preventing private groups from enforcing the Refugee Act is the only way to ensure the Act is applied in a way the United States is willing to abide with respect to its own obligations.  Otherwise, judicial interpretation of the Act could, without input from the United States (let alone a politically accountable exercise of enforcement discretion), ultimately preclude a President's later decision to suspend acceptance of refugees coming from a particular country owing to security concerns.

This issue is particularly acute because the section of the Refugee Act Exodus is seeking to enforce, 8 U.S.C. § 1522(a), is actually directed at federal officials, not state officials.  Like many federal grant programs, the Refugee Act sets forth criteria by which federal officials must evaluate whether to pay state grant claims.  It does not purport to regulate state officials directly (which is unsurprising given

the Tenth Amendment's anti-commandeering protections).  It would make little sense to permit a private agency to enforce against state officials statutory reimbursement criteria that purport to bind the hands of federal officials—or to enforce the regulations those federal officials have promulgated to carry out their duties.

On the merits of this preemption claim, just as the Governor's directive steers clear of "national origin" discrimination, so too does it avoid "nationality" discrimination.  The target here is not anyone's race, ethnicity, ancestry or citizenship, but instead the lack of information about refugees who have just been in Syria, where Islamic State is training Islamic jihadists to disguise themselves as refugees and then attack Western countries.  Again, no matter where a refugee was born or has citizenship, if that refugee resided in Syria before becoming a refugee, that is a red flag that, by the admission of senior federal officials, the United States lacks sufficient information to screen that person effectively.

3.     The district court also erred with respect to the remaining considerations for a preliminary injunction.  A plaintiff cannot claim irreparable harm when a claim for damages is available as redress.  Here, Exodus is essentially claiming that FSSA is breaching its grant agreement with Exodus by refusing to pay claims for services rendered to refugees who have fled Syria.  If the Governor's directive constitutes such a breach, Indiana law permits Exodus to bring a damages claim in state court.  Exodus is not entitled to a preliminary injunction simply because one of its legal theories arises from the Fourteenth Amendment rights of its

25

clients.  *Its* injuries—the only injuries that permit it to bring this case—are redressable through a damages claim.

Public policy and the balance of harms also favor the State.  The most essential function of a State is to protect the safety and security of its citizens, but the district court gave that interest short shrift.  Instead, the court determined that the only public interest at issue was the interest in protecting the equal protection rights of refugees who have not even arrived in the United States.  The preliminary injunction standard requires a *balance* of harms and interests, and here that balance favors allowing the Governor to take limited action to deter resettlement in Indiana of refugees whose backgrounds remain inscrutable, and who therefore may represent a serious public safety threat.

## ARGUMENT

## I.   The Governor's Directive Does Not Violate Constitutional or Statutory Equal Protection Rights

The Governor's directive applies to all refugees coming from a particular geographic location (Syria), regardless of race, ethnicity, ancestry, nationality, or national origin.  Because the directive does not discriminate on any unlawful bases, it is subject to rational basis review, not strict scrutiny.  Regardless, the directive is narrowly tailored to serve a compelling interest in securing the safety of Indiana citizens.

### A.   The directive does not discriminate against national origin

1.   To the extent the Equal Protection Clause makes national origin a suspect classification, it does so as a proxy for race or ethnicity.  *See Regents of*

*Univ. of Cal. v. Bakke*, 438 U.S. 265, 305, 307 (1978) (equating national origin with ethnic origin); *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973) (equating national origin with ancestry, not citizenship).   The Supreme Court, for example, has invalidated statutes drawing distinctions among citizens on the basis of Japanese descent.   *Oyama v. California*, 332 U.S. 633, 646 (1948) (citing *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.").

The Governor's decision to suspend, in part, State participation in the Refugee Act grant program for refugees fleeing Syria does not stem from refugees' ethnic or racial origin, but from the particular threat posed by terrorists fleeing a specific geographic region (Syria) disguised as refugees.   The directive applies to all refugees coming from Syria, regardless of race, ethnicity, ancestry, nationality or national origin.   It will affect payment of grant monies to resettlement agencies for services rendered to refugees of, say, Arabic, Armenian, or Kurdish (or any other) descent whose country of habitual residence was Syria, but will not affect grant monies payable for services rendered to refugees of those same ethnicities whose habitual residence was Lebanon, Turkey, or anywhere else.   *See* ECF No. 41-8 (noting that people of these races live in each country); *cf.* App. 15 (noting past State participation in resettlement of refugees fleeing Syria who were born in other countries such as Lebanon and Jordan).

2.     In response to the point that "national origin" is a proxy for race and ethnicity, the district court cited *Graham v. Richardson*, 403 U.S. 365, 371 (1965), for the proposition that the Supreme Court has equated "nationality" with "national origin" for purposes of heightened scrutiny under the Equal Protection Clause. Short App. 20. Yet, in providing examples of what "nationality" means in the equal protection context, the Court in *Graham* cited cases having only to do with discrimination based on race or ancestry:  *Oyama*, 332 U.S. at 644 (holding that a California law restricting land transfers discriminated against the petitioner based on his "racial descent"); *Korematsu v. United States*, 323 U.S. 214, 216 (1944) (upholding a World War II executive order excluding persons of Japanese ancestry from areas deemed critical to national defense); and *Hirabayashi*, 320 U.S. at 100 (affirming conviction under World War II executive order subjecting persons of Japanese ancestry to a curfew in certain military areas).  *Graham,* 403 U.S. at 372 n.5.

Regardless, the Governor's directive has nothing to do with alienage, race, ethnicity, ancestry, or nationality, whether that means Syrian citizenship or something else.  It has to do instead with the inscrutability of the backgrounds of refugees of whatever origin who are flowing directly out of Syria.  *See* App. 98; ECF Nos. 41-18 at 50, 41-20.  This is a measure justified by *experiences* of refugees (*i.e.*, the experience of residing in Syria before becoming a refugee) that unfortunately, and for the time being, implicate security concerns—not immutable characteristics that forever represent a barrier to government benefits.

The district court also asserted that "the Supreme Court has held that classifications based on 'country of origin' are subject to strict scrutiny, and in so doing discussed 'country of origin' in term[s] of both ancestry and nationality." Short App. 20 (citing *Oyama*, 332 U.S. at 640). Again, however, the classification at issue in *Oyama* had to do with ancestry, not nationality. Specifically, California's Alien Land Law provided that aliens ineligible for American citizenship could not acquire, own, occupy, lease, or transfer agricultural land. *Oyama*, 332 U.S. at 636. The petitioner's father, a Japanese citizen ineligible for naturalization, purchased land in California and deeded it to the petitioner, who was an American citizen. *Id.* The Court held that escheating the land to the State as a remedy for violation of the Alien Land Law would violate equal protection rights. *Id.* at 644. "The only basis for this discrimination against an American citizen," the Court explained, "was the fact that his father was Japanese and not American, Russian, Chinese, or English." *Id.* The Court referenced "country of origin," only when explaining that the California law discriminated "solely on the basis of . . . *parents'* country of origin[,]" *i.e.*, on the basis of ancestry. *Id.* at 640 (emphasis added).

In all events, the district court was correct when it suggested that "the precise word used to describe the State's classification" does not matter. Short App. 21. The Governor's directive is based on security concerns arising from limitations on U.S. intelligence-gathering capabilities in the highly compromised nation-state the refugees are fleeing. The directive applies to all refugees coming from Syria

regardless of their race, ethnicity, ancestry, citizenship, nationality, or national origin.

That FSSA has volunteered that it would use the "country of origin" denominated on refugee documents as a method to identify refugees fleeing Syria is not cause for heightened constitutional scrutiny. That is simply the best method state officials have been able to discern for identifying refugees fleeing Syria. *See* App. 101; ECF No. 64 at 9–10. As the record demonstrates, it is a fairly targeted method, neutral as to any particular refugee's *actual* national origin or nationality. App. 15 (noting that the State has in the past paid claims to resettle native Lebanese and Jordanians fleeing Syria).

The United States, however, has explained that a refugee fleeing Syria, but born in Iraq, would have Iraq listed as country of origin on refugee forms. ECF No. 58 at 13. The State's response to this observation has been to adjust its implementation of the Governor's directive, the better both to ensure its efficacy and to safeguard against unlawful discrimination. As FSSA Family Resources Director Shields has testified, the State "would apply the directive to resettlement of an Iraqi national who had entered the refugee program by fleeing Syria, but whose 'country of origin' is designated Iraq." App. 101.

Still, the State is painfully aware that, despite the consultation and information requirements of the Refugee Act, both PRM and the resettlement agencies understand details about the refugee screening and resettlement process they have not shared with state officials. The State is eager and willing to learn

how it might even more effectively target its implementation of the Governor's directive.  In short, if there is a more precise way to identify refugees fleeing Syria, regardless of race, ethnicity, citizenship, nationality, national origin, etc., FSSA is willing to use it.  *See id.*  At present, however, FSSA has access only to as much information respecting the refugees as the federal government, national voluntary agencies, and local resettlement agencies are willing to provide.

3.     In its Order, the district court commented, "[i]f this is not national origin discrimination, the Court does not know what is."  Short. App. 22.  Respectfully, national origin discrimination is when, for example, a government precludes any Japanese person from moving freely about the country or from engaging in commercial transactions, not because of threats implied by individual experience, but because of prejudices about racial, ethnic, and ancestral heritage.  Here, the Governor's directive is justified not by reference to racial, ethnic, and ancestral categories, but to the individual experience of each refugee as having immediately just been in Syria, where the federal government acknowledges it lacks information resources for background checks.

This is no more national origin discrimination than would be a quarantine of refugees from a particular region because they may carry a communicable disease specific to that region.  *Cf.* Polly J. Price, *Sovereignty, Citizenship, and Public Health in the United States*, 17 N.Y.U. J. Legis. & Pub. Pol'y 919, 934 n.73 (2014) (noting that the States' primacy over public safety has historically included screening immigrants for disease, which States once undertook by way of seaport

quarantines); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 20 (1824) (observing state quarantine legislation to be valid despite effects on interstate commerce). State officials must be able to take action to protect public safety, and sometimes the threats that arise are—owing to highly volatile factual circumstances rather than base prejudices—appropriately defined by reference to a foreign country's borders. This is one of those times.

### B.     The Governor's directive is justified by a compelling interest in safeguarding the security of Indiana residents

Even if the Governor's directive must be narrowly tailored to serve a compelling government interest, it survives that test as well.

1.     The directive is justified by a compelling interest in protecting Indiana residents from the well-documented threat of terrorism posed by a flood of inscrutable refugees fleeing Syria. Congressional testimony and reports indicate that Islamic State terrorists are attempting to infiltrate refugee populations and already have infiltrated populations going to Europe. App. 98. The fact that terrorists from Iraq once infiltrated refugee groups, resettled in Kentucky, and were preparing to engage in terrorist activities in the United States, ECF No. 41-23, not to mention the recent arrests in California and Texas of refugees allegedly supporting Islamic State terrorist activities, ECF Nos. 41-21, 41-22, underscores the seriousness of the threat. The Governor is not required to turn a blind eye to the growing threat of terrorism from Islamic jihadists who seek to exploit our generosity toward refugees, particularly not when refugees are being hurried

through the vetting and resettlement process in a "speeded-up 'surge operation.'" Khetam Malkawi, *supra*.

The district court "assume[d] without deciding that the State has a compelling interest in the safety and security of Indiana citizens," Short App. 23, but held that the Governor's directive is not narrowly tailored to serve this interest. The court noted in particular that "the State's attempt to deter Voluntary Agencies from resettling Syrian refugees in Indiana has been utterly ineffective" as Syrian refugees have been resettled in Indiana since the Governor issued his directive. *Id.* at 24.

But while Exodus has found a way to proceed in the short term through the use of federal matching grant funds from another program, it brought this lawsuit precisely because it cannot sustain that approach in the long term. Matching grants, as opposed to full Refugee Act funding, require a contribution from Exodus, which may prove unsustainable. Furthermore, as Exodus has noted, matching grant funds are available only to refugees who are not receiving other forms of cash assistance, including refugee cash assistance and TANF. ECF No. 86 at 5. These circumstances both negate the need for a preliminary injunction—due to the lack of short-term harm and the availability of a contract action for any unmitigated damages—and underscore the likely long-term efficacy of the Governor's directive.

Nor is it the case, as the United States argued below, that the directive is not narrowly tailored to advance the State's interests because "[t]here is no reason to believe a person intent on causing harm to the United States would be deterred or

impeded by losing access to federally funded job training, child care, or English-language training." ECF No. 58 at 14. This argument misses the point. The directive is not intended to deter potentially dangerous refugees from wanting to resettle in Indiana (a State to which they may have no connection); it is aimed at deterring the *resettlement agencies* from bringing potentially dangerous refugees to Indiana. This bears a direct "connection to public safety[,]" *id.*: If the agencies know the State will not reimburse them for social services they provide to refugees fleeing Syria, they will be less likely to resettle such refugees in Indiana.

What is more, the directive is not "dramatically over-inclusive" because "it would deter Voluntary Agencies from settling *all* Syrian refugees in Indiana, not just those who supposedly pose a security risk." Short App. 25. It is not possible to tailor the directive more narrowly in this regard. Federal officials have acknowledged that they cannot distinguish actual refugees fleeing the Syrian civil war from Islamic State terrorists impersonating refugees. Again, Director of National Intelligence James Clapper has stated, "We don't obviously put it past the likes of ISIL to infiltrate operatives among these refugees." App. 98. That the directive would apply to "Syrian children as young as four years old," Short App. 25, is not evidence of over-inclusiveness, but merely recognition that small children will be accompanied by parents or other adults who *do* fall into the category of refugees who may very pose a security risk.

The directive is narrowly tailored in that it affects only grant monies that would go to local resettlement agencies that are proximately involved in the

decision where to settle refugees. *See* ECF No. 41-40 at 17–18. Again, it does not restrict direct payments to the refugees themselves once they are here, as the refugees have little control over where they are settled and the State is not going to "punish[] Syrian refugees already in Indiana in the hopes that no more will come." Short App. 25. As the Governor has stated, "I have no intention of interfering with the ordinary administration of state government relative to people that are legally within the state of Indiana[.]" ECF No. 41-42.

The directive is a measured restriction narrowly tailored to deter resettlement agencies from accepting for resettlement in Indiana refugees late of Syria. Furthermore, because it is based on the federal government's admitted lack of access to critical information about Syrian refugees amidst the Syrian civil war, rather than immutable characteristics of the refugees, the directive will last only as long as the circumstances giving rise to it.

## C. The Governor's directive does not violate Title VI for the same reasons it does not violate the Equal Protection Clause

Title VI proscribes "only those racial classifications" proscribed by the Fourteenth Amendment, *Bakke*, 438 U.S. at 287, and only on the same terms as the Equal Protection Clause. *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (citing *Bakke*, 438 U.S. at 287). Accordingly, just as the State is not engaged in unlawful discrimination under the Equal Protection Clause, neither is it so engaged under Title VI. And, just as the justification and scope of the Governor's directive pass muster under the Equal Protection Clause, so too are they sufficient for Title VI.

## II.    The Governor's Directive Is Not Preempted by the Constitution's Naturalization and Foreign Affairs Powers

### A.    States' historic, fundamental, and compelling interest in protecting public safety rebuts constitutional preemption

"A State's most basic responsibility is to keep its people safe." *Caetano v. Massachusetts*, __ S. Ct. __ (Mar. 21, 2016), 2016 WL 1078932, at *7 (Alito, J., concurring).  The State has a historic, fundamental, primary, and compelling interest in exercising its traditional police powers to protect its citizens from the threat of terrorist violence.  This power stems from the States' role as independent sovereigns in the federal system that have "historic primacy . . . [in] matters of health and safety." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

States' primacy over public safety has historically included screening immigrants, for example with respect to disease, which States once undertook by way of seaport quarantines.  *See, e.g.,* Polly J. Price, *supra*; *Gibbons*, 22 U.S. at 29; *Smith v. Turner* ("The Passenger Cases"), 48 U.S. (7 How.) 283, 457 (1849) (Grier, J., opinion) (overturning a state tax on immigrants but otherwise recognizing, notwithstanding Congress's naturalization power, state residual power over public safety—even respecting immigrants—founded on "the sacred law of self-defence, which no power granted to Congress can restrain or annul").

The Constitution itself embodies this understanding of state primacy over public safety, even as it enumerates plenary authority over immigration and foreign affairs to the federal government.  It presupposes that States maintain a core role over domestic security.  For example, the Domestic Violence Clause of Article IV,

section 4 leaves it to States to quell domestic insurrection (and other local violence), and authorizes federal assistance only upon application of the state legislature (or the Governor if there is no time to convene the legislature). Relatedly, Article I, section 10 recognizes the right of States to engage in war not only upon invasion, but "in such imminent danger as will not admit of delay."  For its part, the Indiana Constitution reflects this bargain and duly provides that the Governor "shall be commander-in-chief of the armed forces, and may call out such forces, to execute the laws, or to suppress insurrection, or to repel invasion."  Ind. Const. art. 5, § 12.

In other words, the broad structure of government in the United States leaves States as the first line of defense against local violence, *i.e.*, violence undertaken by individuals residing in a State targeting a particular city or other community, or other calamities. *Cf.*, Posse Comitatus Act, 18 U.S.C. § 1385 (generally precluding use of the United States Army or Air Force for local law enforcement); Stafford Act, 42 U.S.C. § 5170 (precluding federal assistance for natural disasters absent application by a State's Governor).

Accordingly, the Court should be particularly reluctant to interpret the Constitution (or other federal law) to preempt a Governor's actions to protect state residents from terrorist threats.

**B.**  **There is no Naturalization Clause preemption because the Governor is not regulating who may enter the United States or dictating terms for remaining in the United States**

With respect to Naturalization Clause field preemption, federal immigration laws should not preempt state public safety directives "in the absence of persuasive

reasons either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained." *De Canas v. Bica*, 424 U.S. 351, 356 (1976) (quoting *Fla. Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142 (1963)), *superseded by statute on other grounds*.  Indeed, the Court in *DeCanas* specifically reaffirmed States' wide leeway to "deal[] with aliens" without being preempted, 424 U.S. at 355, and expressly rejected the possibility the INA was so comprehensive that it left no room for state action in the field.  *Id.* at 359.  Neither the text nor the legislative history of the INA indicated that Congress had a "clear and manifest purpose" of "complete[ly] oust[ing] . . . state power[.]"  *Id.* at 357 (internal citations omitted).  What is more, said the Court, "there would have been no need, in [prior cases], even to discuss the relevant congressional enactments in finding pre-emption of state regulation if all state regulation of aliens was ipso facto regulation of immigration[.]"  *Id.* at 355.

By way of example, in *Keller v. City of Fremont*, 719 F.3d 931, 937, 941 (8th Cir. 2013), the court rejected a field preemption challenge to a municipal ordinance that precluded a city from hiring illegal aliens or providing them with rental housing benefits.  The court concluded that, because such restrictions did not regulate which aliens could be admitted or remain in the country, and because there was no evidence that aliens denied these benefits would leave the country, the ordinance did not constitute an attempt to regulate immigration.  *Id.* at 941.

The same is true here.  The Governor is merely refusing to pay grant monies to private agencies for resettling refugees fleeing Syria in an effort to deter such

38

resettlement. There is no evidence any refugees would leave the country as a result.

The preemption cases Exodus cited in the district court mostly invoke particular federal statutes and commitments, not broad federal authority. *See Arizona v. United States*, 132 S. Ct. 2492, 2502, 2504, 2505–06 (2012) (relying on federal alien registration statute to invalidate state law criminalizing failure to comply with that federal statute, relying on federal statutes specifically attaching consequences for unlawful aliens who work to preempt state law criminalizing such employment, and relying on federal statutes detailing the process for dealing with removable aliens to preempt state law authorizing arrest of removable aliens); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 401, 420 (2003) (preempting statute requiring insurers "to disclose information about all policies sold in Europe between 1920 and 1945" based on specific federal commitments concerning recovery of assets converted and confiscated by the Nazi Government); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 366, 376 (2000) (invalidating a statute prohibiting state agencies from purchasing "goods or services from companies doing business with Burma" as inconsistent with federal statutes specifically governing how companies may transact business in Burma); *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941) (preempting state statute requiring alien registration as incompatible with federal alien registration law).

In *Chy Lung v. Freeman*, 92 U.S. 275, 276 (1875), which invalidated a state statute requiring some, but not all, immigrants to pay a bond or be denied access to

the United States, the Court did rely on broad principles rather than particular federal statutes. But that case, quite in contrast with this one, implicated the interests of other countries in the "protection of the just rights" of their citizens who go abroad. *See Arizona*, 132 S. Ct. at 2498–99 (citation omitted). As the Court observed in *Arizona* (with specific reference to *Chy Lung*), "[i]t is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* at 2498. The Governor's directive, in contrast, has to do with refugees, *i.e.*, immigrants ostensibly fleeing persecution by their countries. There is no similar call to be solicitous of, for example, any unlikely concerns Syria might have for these refugees. Regardless, the Governor's directive concerns state participation in an optional federal program, not independent and direct state regulation of immigration.

### C.    Suspending Refugee Act grants in no way implicates the Foreign Affairs Power

Exodus has also argued that plenary federal power over foreign affairs preempts the Governor's directive.

First, Exodus has suggested that the directive somehow violates the United Nations Convention Relating to the Status of Refugees, ratified pursuant to the United Nations Protocol Relating to the Status of Refugees. ECF No. 16 at 18–19. The Refugee Convention, however, is not a self-executing treaty. *See* ECF No. 41-37 at 89. Non-self-executing treaties "are not domestic law unless Congress has . . . enacted implementing statutes." *Medellin v. Texas*, 552 U.S. 491, 505

(2008).   Here, Congress's enabling legislation first took the form of 8 U.S.C. § 1253(h) (1976 ed.), which "applied *only* to deportation of refugees already in the United States."  ECF No. 41-37 at 87.

Moreover, Congress passed the Refugee Act to implement its Convention obligations, but the Act affords no right of action to Exodus, and the Convention provides no independent private right of action of its own.  *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985) ("[I]f not implemented by appropriate legislation [treaties] do not provide the basis for a private lawsuit unless they are intended to be self-executing.").

Nor is there any plausible argument that the Governor's directive undermines the Convention, whether on its own or as implemented by the Refugee Act.  Neither contains any provisions governing where in a country a refugee may settle or the extent of assistance required from the sanctuary government.  Article 33 of the Convention—the particular Article invoked by Exodus—merely establishes the general principle of "nonrefoulement" whereby "aliens fleeing persecution could not be sent back to their native countries."  *Garcia v. I.N.S.*, 7 F.3d 1320, 1324 (7th Cir. 1993).   There is no credible claim that the Governor's directive threatens "refoulement" of refugees fleeing Syria. *Cf. United States v. Pink*, 315 U.S. 203, 230 (1942) ("[T]reaties with foreign nations will be carefully construed so as not to derogate from the authority and jurisdiction of the States of this nation unless clearly necessary to effectuate the national policy.").

41

More generally, Exodus has argued that the Governor's directive would lead to "serious international consequences." ECF No. 16 at 20. Yet the Governor's directive does not impose pressure on Syria, undercut the President's diplomatic discretion, or weaken his negotiating ability. The character of the directive is distinguishable from the state statutes in *Crosby* and *Garamendi*, which undermined particular federal agreements with foreign nations. *Garamendi*, 539 U.S. at 424 (finding that a state statute limited the President's ability to negotiate international issues); *Crosby*, 530 U.S. at 376–77 (finding that a statute employed economic pressure on Burma and "undermine[d] the President's intended statutory authority").

Critically, were the State to withdraw entirely from the Refugee Act grant program, no one would assert such action would somehow carry "serious international consequences." Indeed, there is a separate federal grant program, known as Wilson-Fish, that awards grants to private entities who resettle refugees in the twelve States that do not participate in the Refugee Act. 8 U.S.C. § 1522(e)(7); 45 C.F.R. § 400.69; ECF Nos. 41-38, 41-44. Therefore, it cannot be federal policy that States must in all circumstances administer these grants, and there is no credible connection between Refugee Act grant administration *by States* and U.S. foreign policy.

**D.     Anti-commandeering    principles    refute    any    exclusive constitutional powers preemption claims**

The Constitution's anti-commandeering principles also refute Exodus's constitutional preemption theories, which would essentially force States to participate in a federal grant program.

Congress may "attach conditions on the receipt of federal funds" to encourage a State to adopt a particular program. *New York v. United States*, 505 U.S. 144, 167 (1992) (citations and internal quotations omitted). Anything more, however, is a prohibited invasion of a State's sovereignty. *Printz v. United States*, 521 U.S. 898, 928 (1997) (explaining that States "remain independent and autonomous within their proper sphere of authority" as an "essential attribute of . . . sovereignty"); *NFIB v. Sebelius*, 132 S. Ct. 2566, 2608 (2012) ("Congress has no authority to order the States to regulate according to its instructions. Congress may offer the States grants and require the States to comply with accompanying conditions, but the States must have a genuine choice whether to accept the offer.").

Accordingly, structural provisions of the Constitution that enumerate exclusive federal powers, and thereby limit or preclude state powers, do not commandeer state participation in federal grant programs. For example, while the Commerce Clause precludes state regulatory discrimination against interstate commerce, it does not require states to distribute federal grants to interstate commercial enterprises. Congress cannot even use its Commerce Clause power to abrogate state sovereign immunity, *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 364 (2001), much less to require state officials to participate in federal

grant programs, *Sebelius*, 132 S. Ct. at 2608, conduct gun background checks, *Printz*, 521 U.S. at 925, or to take title and dispose of private nuclear waste. *New York*, 505 U.S. at 149, 162.

The same is surely true of the textually adjacent Naturalization power, U.S. Const. art. I, § 8, cl. 4, and the accumulation of Article I, section 8 and Article II powers that constitute the plenary federal Foreign Affairs power. *Toll v. Moreno*, 458 U.S. 1, 10 (1982), *Pink*, 315 U.S. at 244. Given the basic parameters of Our Federalism and the more specific significance of the Tenth Amendment and the anti-commandeering doctrine, these provisions cannot be understood to require state officials to participate in refugee resettlement grant programs. Otherwise, all states would be required to participate in the Refugee Act and there would be no need for the Wilson-Fish Act. Exodus's plenary-power preemption arguments are too broad to be plausible.

## III.    The Governor's Directive is Not Preempted by the Refugee Act

### A.    Exodus has no right of action to enforce Section 1522(a) of the Refugee Act, which in any event is directed at federal, rather than state, officials

In the district court, Exodus made clear that it seeks to enforce the terms of the Refugee Act—specifically § 1522(a)—only by way of an action in equity under the Supremacy Clause, rather than by way of 42 U.S.C. § 1983. Given the existence of a federal agency remedy to enforce the terms of Refugee Act grants, however, Congress has displaced any such claim.

Section 1522(a) of the Refugee Act supplies "conditions and considerations" for refugee resettlement aimed at the Director of ORR and the Secretary of HHS. The statute directs the manner in which the federal government works with Voluntary Agencies and state and local governments to determine where refugees will be resettled and how the federal government will fund and provide services to them. *See generally* 8 U.S.C. § 1522(a).

Section 1522(a)(2) instructs the Director to "consult regularly" with state and local governments and Voluntary Agencies concerning "the appropriate placement of refugees among the various States and localities," taking into account factors such as the proportion of refugees already in the area, the availability of employment and housing, and the likelihood that refugees placed in that area will become self-sufficient. 8 U.S.C. § 1522(a)(2)(A), (C). This provision simply directs the federal government to establish "policies and strategies" for determining where and how refugees are placed among the States. *Id.* § 1522(a)(2)(B), (C).

Similarly, Section 1522(a)(5), which provides that "[a]ssistance and services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion," is addressed to the Director of ORR, not the States. 8 U.S.C. § 1522(a)(5). All provisions in subsection (a)(1)–(4) direct a federal government official to take some action. Paragraph (5) addresses conditions for a program carried out by the Director, Secretary, and other officials, which indicates that it is addressed to those officials. This understanding of paragraph (5) is supported by subsection (d)(2)(A), which frames grants as "reimbursement[s],"

and implies that States are free to make payments for resettlement on their own, but that federal officials may provide "reimbursement[s]" only in accord with conditions prescribed in subsection (a). *See* 45 C.F.R. § 400.5.

Indeed, the only obligation Section 1522(a) imposes on the State is to offer a compliant State Plan "[a]s a condition for receiving assistance[.]" 8 U.S.C. § 1522(a)(6). Under these circumstances, the proper remedy for a State's violation of a condition of federal funding governed by a State Plan is for the Secretary of HHS to withhold funds. Refugee Act resettlement grants represent a cooperative endeavor between the federal government and the States. It is not for private citizens to enforce the terms of that cooperation. The Secretary's remedial authority therefore precludes an equitable action under the Supremacy Clause. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. at 1378, 1385 (2015) (precluding private equitable enforcement of section of the Medicaid Act containing ambiguous text and broad federal authority over funding stream to states).

The district court nonetheless permitted private enforcement of the Refugee Act on the theory that "there is no withholding of funds provision in the Refugee Act, as there was in § 30A of the Medicaid Act." Short App. 9. Yet the Refugee Act grants the Secretary of HHS and the Secretary of State broad authority to monitor the performance of the States in providing refugee assistance. 8 U.S.C. § 1522(a)(7)–(8). Each participating State must develop a State Plan and meet certain standards and goals "[a]s a condition for receiving assistance under [the Refugee Act.]" 8 U.S.C. § 1522(a)(6). If these conditions are not met, it is surely

46

within the power of the federal government to withhold funding from non-compliant States.

The district court also held that "unlike the 'broad' provision at issue in *Armstrong* . . . , the provision at issue in the Refugee Act here is a straight-forward anti-discrimination provision" of the type "federal courts routinely enforce . . . ." Short App. 9. The anti-discrimination provision (Section 1522(a)(5)) becomes much less "straight-forward," however, when viewed within the larger context of Section 1522(a), which again merely provides broad rules for the Director of ORR to follow in determining refugee placement.

Understanding Section 1522(a) to apply to the federal government rather than to the States is critical  for the enforcement mechanisms whereby the federal government must make the initial, politically accountable assessment of how to interpret (and therefore enforce) its provisions. Under Section 1522(a), federal officials are charged with making initial determinations as to what constitutes discrimination based on "race, religion, nationality, sex or political opinion" and then acting on those determinations.

That interpretive step is particularly important given the federal government's own stake in the meaning of these terms. Under Exodus' own theory of this case, any curtailment of the admission of refugees into the United States based on circumstances in the country of origin would violate U.S. treaty obligations. *See* Convention Relating to the Status of Refugees, art. 3, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (requiring that the provisions of the

Convention be applied to refugees without discrimination as to "country of origin") (made applicable to the United States via the Protocol Relating to the Status of Refugees, *see* ECF No. 58 at 11 n.2.). The United States has acknowledged that it "classifies refugees by nationality for various purposes, including identifying refugees of 'special humanitarian concern' and subjecting refugees of certain nationalities to additional or different security screening protocols." ECF No. 58 at 11. Presumably the United States would dispute that such practices could legitimately be called into legal question. Similarly, if President Obama were to halt resettlement of Syrian refugees based on the threats they pose to national security, the federal government would dispute that such action violates United States treaty obligations. *Cf.* ECF No. 41-23 (describing an apparent alteration of Iraqi refugee review by the State Department following discovery of two al-Qaeda terrorists living as Iraqi refugees in Bowling Green, Kentucky).

With respect to the anti-discrimination requirements of the U.N. Convention and the Refugee Act, there is no principled distinction between that kind of decision and the decision made by the State of Indiana to deter the resettlement of refugees coming from a particularly volatile region that is not subject to reliable U.S. intelligence-gathering. If the State's decision constitutes discrimination on the basis of nationality in violation of the Refugee Act, so too must any similar decision by the United States violate the non-discrimination provision of the Refugee Convention.

Given the federal government's important interest in ensuring that "nationality" discrimination is defined in a way that permits it sufficient flexibility under its treaty obligations, only the United States should have discretion to enforce Section 1522(a). Only when the United States makes the decision to pursue enforcement of Section 1522(a)(5) against the States can courts know whether the federal executive is willing to live with a particular interpretation of that section, especially one that may plausibly harm federal interests not before the court. Equitable enforcement discretion should not rest with a local resettlement agency that, unlike the federal government, has no stake in the collateral consequences of its claim.

## B. The federal-state "consultation" required by the Refugee Act imposes requirements on federal officials; it does not restrict state officials from protecting public safety

Under the Refugee Act, ORR must "consult regularly" with state governments on the "distribution of refugees among the States" before it places refugees in those States and "shall develop and implement" policies and strategies to resettle refugees in the United States "in consultation with" state government representatives. 8 U.S.C. § 1522(a)(2)(A)–(B). The federal government must take a State's recommendations into account "to the maximum extent possible." *Id.* § 1522(a)(2)(D). States can and do balk entirely at resettlement of various refugee populations. *See, e.g., Fernandez-Roque v. Smith*, 734 F.2d 576, 579, 584 (11th Cir. 1984) (federal government acceded to Florida Governor's request for no additional Cuban refugees).

Yet in the district court, Exodus maintained that Governor Pence's directive is preempted because it exceeds the "consultation" role envisioned for States under the Refugee Act. ECF No. 16 at 15–16. If anything, in the context of Syrian refugees, there may be a substantial question whether the United States has abided by its consultation obligations. Texas and Alabama, for example, are seeking federal court injunctions against resettlement of Syrian refugees in those States on account of the federal government's failure to consult with the States on the matter. *See* ECF Nos. 41-31, 41-32.

Regardless, the federal government's consultation requirement imposes no independent limits on a State's authority to suspend grant payments for resettlement in the name of public safety. Imposing such limits would upset the important balance of state-federal power in public safety, which has long been an area of state concern. *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1985 (2011) (noting the presumption against preemption); *Printz*, 521 U.S. at 928 (explaining that States must "remain independent and autonomous within their proper sphere of authority"). States' traditional primacy over public safety (which historically has even extended to screening immigrants for risk of public harm) should preclude an interpretation of Section 1522 that preempts a Governor from temporarily suspending participation over an issue of public safety.

**C. The Governor's directive is not preempted by statutory text directed to federal officials stating that "[a]ssistance and services funded under this section shall be provided to refugees without regard to . . . nationality"**

Governor Pence's directive is not preempted by the requirements in 8 U.S.C. § 1522 and 45 C.F.R. § 400.5 mandating that federal grant assistance be provided "without regard to race, religion, nationality, sex, or political opinion." ECF No. 16 at 15–16.  Again, Section 1522(a)(5) imposes duties on federal officials, not state officials.  The Court would both contravene the structure of subsection (a)(1) and violate the clear-notice requirement if it held that paragraph (5) imposed an obligation directly on States. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981) (requiring that grant conditions imposed on States must be communicated "unambiguously" and with "clear notice" to be enforceable).

Even if it applies to States, Section 1522(a)(5) only precludes discriminatory targeting based on nationality (race, etc.) *as such*.  The Governor's directive is not of that character.  Properly understood, it does not target resettlement of Syrians as a nationality, or any race or ethnicity of people in Syria.  Resettlement of a person of Syrian birth fleeing Iraq or Lebanon, for example, would not be affected.  Rather, it precludes (in a temporary and limited way) payment of grant monies on account of refugees *fleeing* Syria, regardless of race, ethnicity or nationality.  Resettlement of, for example, ethnic Kurds or Armenians fleeing Syria would be treated the same as resettlement of ethnic Arabs fleeing Syria.  In fact, the State has in the past paid claims to resettle native Lebanese and Jordanians fleeing Syria, App. 15, which

demonstrates that being a refugee fleeing Syria does not mean being of any particular race, ethnicity, or birth nationality.

In other words, the Governor's directive has to do *not* with nationality as race, ethnicity, or even citizenship, but with a war-torn country concerning whose residents the United States has little reliable information. *Cf.* App. 98; ECF No. 41-9 at 4. The situation in that country not only fosters international terrorist attacks against the West, but also makes it impossible to determine which purported refugees might really be terrorists. The directive is designed to protect Indiana residents' safety, not to discriminate based on race, ethnicity, or nationality.

Notably, Voluntary Agencies and local resettlement agencies also take account of refugees' country of origin. Both have means to designate nations whose refugees they are willing to resettle. ECF No. 41-40 at 63–66. They make such decisions based on a variety of factors, including resources to address native languages, LGBT issues, or mental trauma arising from local calamities. *Id.* at 36–39. Exodus did not designate refugees from Syria until FY2014. *Id.* at 67. And Exodus has explained that it might choose not to resettle individuals from a particular region for any number of reasons, including a lack of capacity to serve the region or a lack of language services tailored to that region. *Id.* at 59; *cf. id.* at 40–41 (describing instance where Exodus chose not to accept a resettlement case). If these agencies can use a refugee's country of origin to make resettlement judgments, then the Governor can do the same for reasons of public safety without being declared to have targeted "nationality."

52

## IV.    The District Court Erred in Finding That Irreparable Harm, the Balance of Harms, and the Public Interest Favor Injunctive Relief

The district court improperly used its conclusion about the merits to bootstrap the other preliminary injunction factors in Exodus's favor.

"'Irreparable' in the injunction context means not rectifiable by the entry of a final judgment." *Walgreen Co. v. Sara Creek Prop. Co.*, 966 F.2d 273, 275 (7th Cir. 1992) (citations omitted).  The district court accepted Exodus's argument that "an ongoing constitutional violation constitutes irreparable harm."  Short App. 29.  True, "for *some* kinds of constitutional violations, irreparable harm is presumed[,]" *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (emphasis added)—but not for *all* kinds.  For Fourteenth Amendment claims, this Court has previously held that temporary loss of income and benefits is not irreparable injury.  *Ciechon v. City of Chicago*, 634 F.2d 1055, 1057–58 (7th Cir. 1980).

Here, Exodus alleges as irreparable harm loss of Refugee Act social service funds from the State.  Any claim that the Governor's directive causes unlawful financial harm, however, is remediable through an action at law and thus cannot justify a preliminary injunction.  What Exodus really seems to be asserting is that, to the extent it provides services to refugees but the State then refuses to pay claims based on those services, the State will be in breach of its grant agreement with Exodus.  *See* ECF Nos. 1 at 10–11, 16 at 10, 12.  In that case, Exodus could bring a breach of contract lawsuit against the State in state court seeking payment of claims.  Ind. Code § 34-13-1-1.  As its only injury (if any) is monetary and would be recoverable as such against the State through a contract action, there is no

irreparable harm. *See, e.g., Signode Corp. v. Weld-Loc Sys., Inc.*, 700 F.2d 1108, 1111 (7th Cir. 1983) ("[A] defendant's ability to compensate plaintiff in money damages precludes issuance of a preliminary injunction.") (citation omitted).

Injunctive relief is always an "extraordinary and drastic remedy," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted), and when the party opposing a preliminary injunction is the government, public policy considerations weigh even more heavily against granting relief, as "the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Ill. Bell Tel. Co. v. Worldcom Techs, Inc.*, 157 F.3d 500, 503 (7th Cir. 1998). *See also United States v. Rural Elec. Convenience Co-op. Co.*, 922 F.2d 429, 440 (7th Cir. 1991) (noting that "the government's interest is in large part presumed to be the public's interest").

Exodus must also show that "the balance of error costs tilts in favor of relief." *Ill. Bell*, 157 F.3d at 503. Yet the district court disposed of both the "public interest" inquiry and the balance of the equities in a summary and circular fashion. Said the court, "[t]he public interest is served when constitutional rights are vindicated." Short App. 34. Further, "the State . . . cannot claim that being required to comply with the Constitution is harmful." *Id.* at 30. These statements completely ignore the State's compelling interests in public safety. Courts must give proper consideration of "the effect that granting or denying the injunction will have on nonparties[,]" *Stewart v. Taylor*, 104 F.3d 965, 968 (7th Cir. 1997), which must perforce include public safety. *Cf. Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

54

26 (2008) (concluding that the public interest in conducting naval training exercises with active sonar outweighed the possible harm to marine life and the plaintiff scientists and whale-watchers).

Here, absent an injunction, Exodus will still be able to carry out its mission and receive funding for it. The State, on the other hand, is unable under the current injunction to exercise what power it has to secure the safety of its citizens by deterring resettlement of refugees with backgrounds that cannot be properly vetted owing to the lack of U.S. presence in Syria. The balance of hardships weighs in favor of the State.

## CONCLUSION

For the foregoing reasons, the State respectfully requests that this Court reverse the judgment of the district court.

Respectfully submitted,

GREGORY F. ZOELLER
Attorney General of Indiana

*s/Thomas M. Fisher*
THOMAS M. FISHER
Solicitor General

HEATHER HAGAN McVEIGH
LARA LANGENECKERT
JONATHAN R. SICHTERMANN
Deputy Attorneys General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov

## CERTIFICATE OF WORD COUNT

I verify that this brief, including footnotes and issues presented, but excluding certificates, contains 13,892 words according to the word-count function of Microsoft Word, the word-processing program used to prepare this brief.

By: _s/ Thomas M. Fisher_
      Thomas M. Fisher
      Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system, which sent notification of such filing to the following:

| | |
|---|---|
| Kenneth J. Falk | Judy Rabinovitz |
| Gavin M. Rose | Omar Jadwat |
| Jan P. Mensz | Cecilia Wang |
| ACLU OF INDIANA | AMERICAN CIVIL LIBERTIES |
| kfalk@aclu-in.org | UNION FOUNDATION |
| grose@aclu-in.org | jrabinovitz@aclu.org |
| jmensz@aclu-in.org | ojadwat@aclu.org |
| | cwang@aclu.org |

*s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Office of the Indiana Attorney General
Indiana Government Center South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 232-6255
Facsimile: (317) 232-7979
Tom.Fisher@atg.in.gov

## REQUIRED SHORT APPENDIX

Pursuant to Circuit Rule 30, Appellants submit the following as their Required Short Appendix.  Appellants' Required Short Appendix contains all of the materials required under Circuit Rule 30(a).

By:     *s/Thomas M. Fisher*
         Thomas M. Fisher
         Solicitor General

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| EXODUS REFUGEE IMMIGRATION, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:15-cv-01858-TWP-DKL |
| | ) |
| MIKE PENCE in his official capacity as | ) |
| Governor of the State of Indiana, | ) |
| JOHN WERNERT in his official capacity as | ) |
| the Secretary of the Indiana Family and Social | ) |
| Services Administration, | ) |
| | ) |
| Defendants. | ) |

### ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to

Federal Rule of Civil Procedure 65(a) by Plaintiff Exodus Refugee Immigration, Inc. ("Exodus").

(Filing No. 6.)  In late 2015, Indiana Governor Mike Pence ("Governor Pence") directed Indiana

state agencies to not pay federal grant funds to local refugee resettlement agencies, such as Exodus,

for social services these agencies provide to the Syrian refugees they help resettle in Indiana.

Governor Pence asserts that he issued this directive to deter the national resettlement organizations

from placing Syrian refugees in Indiana.  Shortly thereafter, Exodus filed its Complaint against

defendants Governor Pence and John Wernert, the Secretary of the Indiana Family and Social

Services Administration, (collectively, the "State"), asserting that the State's action was preempted

by federal law and discriminated against Syrians in violation of the Equal Protection Clause of the

Fourteenth Amendment and Title VI of the Civil Rights Act of 1964.

Exodus seeks to enjoin the State's action pending the resolution of this case.  The parties

submitted evidence, and the Court held a hearing on Exodus's motion.  For the reasons that follow,

Exodus has demonstrated that it is likely to succeed on the merits of its equal protection claim. The State's conduct clearly discriminates against Syrian refugees based on their national origin. Although the State says it has a compelling reason for doing so—the safety of Indiana residents— the withholding of federal grant funds from Exodus that it would use to provide social services to Syrian refugees in no way furthers the State's asserted interest in the safety of Indiana residents. Exodus has also made the other showings necessary to be entitled to preliminary injunctive relief. Accordingly, Exodus's motion for a preliminary injunction is **GRANTED**.  ([Filing No. 6](#)).

## I.     <u>LEGAL STANDARD</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "To obtain a preliminary injunction, a party must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest." *Grace Schools v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015); *see Winter*, 555 U.S. at 20.  "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).  "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citation and internal quotation marks omitted).  "Stated another way, the district court 'sit[s] as would a

chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being

mistaken.'" *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

## II.   BACKGROUND

### A.   The Resettlement of Refugees in the United States and Indiana

The Refugee Act of 1980, which amended the Immigration and Nationality Act, sets forth

the policies and procedures that govern the resettlement of refugees from other countries in the

United States.   *See* 8 U.S.C. § 1157, *et seq.*   For purposes of federal law, the term "refugee" is

defined as:

> Any person who is outside any country of such person's nationality… and who is
> unable or unwilling to return to, or is unable and unwilling to avail himself or
> herself of the protection of, that country because of persecution or well-founded
> fear of persecution on account of race, religion, nationality, membership in a
> particular social group, or political opinion.

8 U.S.C. § 1158(b)(1).   The number of refugees accepted by the United States is determined by

the President each year as "justified by humanitarian concerns or is otherwise in the national

interest."   8 U.S.C. § 1157(a)(2).   The President has determined that up to 85,000 refugees shall

be admitted to the United States in 2016, at least 10,000 of whom will be Syrian.

The Refugee Act created the Office of Refugee Resettlement ("ORR") within the

Department of Health and Human Services to fund and administer the federal programs related to

the resettlement of refugees in the United States.   *See* 8 U.S.C. § 1521.   Additionally, within the

Department of State, the Bureau of Population, Refugees, and Migration ("PRM") is responsible

for determining which refugees are eligible for resettlement.   PRM funds and manages nine

Resettlement Support Centers ("RSCs") around the world, which are operated by international

nongovernmental organizations.   The RSCs prepare applications for refugees seeking resettlement

in the United States.   This process includes the collection of information from the refugees, security

screenings at the direction of the Department of State and the Department of Homeland Security, and health screenings. The approval process for refugees through PRM usually takes eighteen to twenty-four months.

Refugees accepted for resettlement in the United States are placed into all fifty states through one of three mechanisms: (1) the voluntary adoption of a State Plan for the acceptance of refugees pursuant to the Refugee Act; (2) the Wilson-Fish program; or (3) a joint private-public partnership. Indiana elected to proceed under the first option by adopting a State Plan for resettling refugees in Indiana. To receive federal funds for the resettlement of refugees, the State Plan submitted to ORR must comply with the various requirements of the Refugee Act. *See* 8 U.S.C. § 1522(a)(6)(A). Indiana's refugee resettlement program is administered by the Indiana Family and Social Services Administration ("FSSA").

**B.      Exodus's Role in Resettling Refugees in Indiana**

Exodus, an Indiana non-profit corporation, is one of three local resettlement agencies in Indiana that is dedicated to assisting refugees who are selected for resettlement in Indiana. Its organizational mission is to "work with refugees—worldwide victims of persecution, injustice, and war—to establish self-sufficient lives in freedom and sanctuary for themselves and their families." (Filing No. 16-1 at 2). Once a refugee has been approved for resettlement by the federal government, national organizations known as Voluntary Agencies provide reception and placement services. After a Voluntary Agency accepts a refugee for resettlement from PRM, it notifies an affiliated local resettlement agency, such as Exodus, that it will be receiving the refugee for local resettlement. Exodus has cooperative agreements with two Voluntary Agencies to resettle refugees in Indiana.

4

Upon receiving a notification of resettlement from a Voluntary Agency, Exodus uses federal funds directly from PRM to perform the work necessary to prepare for the refugees' arrival, such as obtaining and furnishing a place for the refugees to live. Once the refugees arrive, however, Exodus receives federal funds passed through the states—specifically, in Indiana, through FSSA. Exodus uses these federal grant funds to provide employment services to refugees, as well as to pay Exodus staff and administrative costs.

In accordance with its State Plan, Indiana utilizes grants from the federal government—often by passing them on to other entities such as Exodus—to ensure that refugees receive the following services: (1) social services provided by local resettlement agencies, such as cultural integration training, job skills training, and adult English language training; (2) temporary cash assistance paid directly to refugees actively seeking employment; (3) medical assistance for initial health screenings and medical treatment provided by local county health departments and resettlement agencies; (4) existing benefits programs such as Medicaid and the supplemental nutrition assistance program ("SNAP"); and (5) school assistance funds paid to the Indiana Department of Education for schools providing English language instruction to refugee children.

## C.   The State's Directive and Its Impact

In August 2015, Exodus was notified that a refugee family from Syria had been approved for placement in Indiana, and Exodus was assigned to assist the family with resettlement. Exodus therefore expended time and resources to prepare for this family's arrival, such as securing adequate housing.

Shortly before the family arrived, Governor Pence, on November 16, 2015, declared that he was suspending the resettlement of Syrian refugees in Indiana. Specifically, he publicly stated that:

[i]n the wake of the horrific attacks in Paris, effective immediately, I am directing all state agencies to suspend the resettlement of additional Syrian refugees in the state of Indiana pending assurances from the federal government that proper security measures have been achieved.  Indiana has a long tradition of opening our arms and homes to refugees from around the world but, as governor, my first responsibility is to ensure the safety and security of all Hoosiers.  Unless and until the state of Indiana receives assurances that proper security measures are in place, this policy will remain in full force and effect.

Governor Mike Pence, *Governor Pence Suspends Resettlement of Syrian Refugees in Indiana*, *at* http://www.in.gov/activecalendar/EventList.aspx?view=EventDetails&eventid=239126&information_id=233816&type&syndicate=syndicate (last visited, Feb. 25, 2016).  The following day, the FSSA notified Exodus of this decision, and asked Exodus to inform "the national resettlement agency that the scheduled placement for the Syrian family scheduled to arrive this Thursday, November 19, and all subsequent Syrian arrivals be suspended or redirected to another state." (Filing No. 16-1 at 46).  The Syrian family scheduled to arrive, which was in route to Indiana, was diverted to Connecticut where they have been resettled.

Despite the State's directive, Exodus continues to resettle Syrian refugees in Indiana.  In January 2016, Exodus resettled a family of four Syrian refugees in Indiana.  Overall, Exodus is projected to receive 890 refugees in the 2016 fiscal year.  Of these refugees, 215 are projected to be from "North East / South Asia," and this number will largely be made up of Syrian refugees. (Filing No. 16-1 at 2).  Exodus remains committed to resettling these Syrian refugees in Indiana, and the Voluntary Agencies have informed Exodus that Syrians will continue to be assigned to Exodus for resettlement in Indiana regardless of the State's directive.

The specifics of the State's directive have been clarified during the course of this litigation.  It now acknowledges that "no one claims that Indiana has authority to close its own borders . . . to Syrians."  (Filing No. 64 at 4) (citations, alternations, and quotation marks omitted).  Therefore, contrary to Governor Pence's public statement, the State is not preventing Syrian refugees from

6

resettling in Indiana; indeed, as stated above, Exodus and other local resettlement agencies have resettled Syrian refugees in Indiana since the State's directive.  Instead, the State will not pay federal grant money to local resettlement agencies, such as Exodus, to reimburse them for social services they provide to Syrian refugees they assist resettling in Indiana.  Specifically, Exodus will not receive reimbursement for social services such as cultural integration training, job skills training, and adult English language training.[1]

The State will, however, continue to provide medical assistance, school assistance, and cash assistance to Syrian refugees if they otherwise qualify, including but not limited to Temporary Cash Assistance for Needy Families, SNAP, and Medicaid benefits.  The State also provides Syrian refugees certain employment and training services via a contract with a separate entity. Such services, however, are not the same as the social services provided by Exodus, and as such, are not an adequate substitute for the employment and language training Exodus's clients' need.

Furthermore, certain refugees are eligible for a federal Matching Grant Program.  This program provides employment training to refugees through funds directly from the federal government.  The four Syrian refugees Exodus has already resettled in Indiana are participating in the Matching Grant Program, but it is Exodus's policy to not simultaneously provide them with the employment training for which Exodus would need State reimbursement.  The Matching Grant Program lasts one-hundred-and-eighty days, after which refugees remain eligible for further employment training using the federal grant funds offered through the State.  Because of Governor Pence's directive, Exodus will not seek reimbursement for social services from the State for the four Syrian refugees currently enrolled in the Matching Grant Program.  However, Exodus is

---

[1] In order to receive reimbursement for these services, "resettlement agencies each month must submit to FSSA[] itemized claims for services rendered to all refugees in the prior month."  (Filing No. 41-6 at 2).

currently providing social services to other Syrian refugees it serves through the federal grant funding passed through the State, rather than via the Matching Grant Program.

The State's decision to not pass on federal funds to reimburse Exodus for social services it provides will have significant repercussions on Exodus's ability to serve the refugees families to whom it is assigned.  To make up for this lost money, Exodus will have to take away services it provides in other areas, which will strain its ability to serve not only its Syrian clients, but all of its clients.  This, says Exodus, will jeopardize its organizational mission to serve all refugees, and it will also potentially cause Exodus to breach its agreements with Voluntary Agencies that place refugees with Exodus.

The state of Indiana continues to welcome refugees from other countries around the world, including Iraq, Iran, and Afghanistan.  The directive applies only to Syrian refugees.

## III.   <u>DISCUSSION</u>

To obtain a preliminary injunction, Exodus "must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest."  *Grace Schools*, 801 F.3d at 795.  The Court will address each of these four factors in turn.[2]

### A.   Likelihood of Success on the Merits

Exodus challenges the State's directive on three grounds: (1) it is preempted by federal law; (2) it constitutes impermissible discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment; and (3) it constitutes impermissible discrimination in violation of Title

---

[2] The United States filed a Statement of Interest in this case pursuant to 28 U.S.C. § 517.  Its statement addresses only the merits of Exodus's equal protection claim, and it agrees with Exodus that the State's conduct violates the Equal Protection Clause.  Where appropriate, the Court will reference arguments made by the United States.

VI of the Civil Rights Act of 1964.  The parties' arguments with respect to Exodus's likelihood of

success on these claims follow several distinct paths.  First, the State raises several procedural

barriers to reaching the merits of Exodus's claims; specifically, it challenges whether a cause of

action exists that permits private enforcement of Exodus's preemption claims, and it contends that

Exodus does not have standing to raise any of its claims.  Second, the parties dispute whether, if

Exodus can overcome these procedural hurdles, it is likely to succeed on the merits of its claims.

In the end, the Court concludes that Exodus has standing to bring its equal protection claim and

that it is likely to succeed on its merits, thus the Court need not ultimately resolve Exodus's Title

VI or preemption claims.  Before turning to Exodus's equal protection claim, a discussion of

Exodus's preemption claims are warranted.

Without delving into the details of Exodus's preemption claims, a cursory review of

Exodus's conflict preemption claim reveals that it too is likely to succeed on the merits.  As an

initial matter, contrary to the State's position, the Supreme Court's decision in *Armstrong v.*

*Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), does not demonstrate that the Refugee Act

precludes the Court from exercising its equitable power to enjoin unlawful executive action, as

neither of the two requisite factors in that case are met here.  First, there is no withholding of funds

provision in the Refugee Act, as there was in § 30A of the Medicaid Act.  *See* 8 U.S.C.

§ 1522(a)(7)-(8).  Second, unlike the "broad" provision at issue in *Armstrong* that created an open-

ended standard for state Medicaid plan payments to be calculated, the provision at issue in the

Refugee Act here is a straight forward anti-discrimination provision.  *See* 8 U.S.C. § 1522(a)(5)

("Assistance and services funded under this section shall be provided to refugees without regard

to race, religion, nationality, sex, or political opinion.").  Far from unadministrable, federal courts

routinely enforce similar anti-discrimination provisions.

9

As to the merits, conflict preemption occurs where the state action "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 578 (7th Cir. 2012).  For reasons similar to those discussed below regarding Exodus's equal protection claim, the State's withholding of federal funds for social services provided to Syrian refugees is diametrically opposed to Congress's goal of providing services to refugees "without regard to . . . nationality."  8 U.S.C. § 1522(a)(5).  Accordingly, a cursory review of Exodus's conflict preemption claim reveals that it too is likely meritorious.

Nevertheless, the Court ultimately resolves the likelihood of success on the merits factor on Exodus's discrimination claims.  Exodus's equal protection and Title VI claims are both predicated on its view that the State's conduct amounts to national origin discrimination in that the State passes on federal funds to Exodus for the social services it provides to its refugee clients except those from Syria.  These claims are coextensive, given that Title VI "'proscribes[s] only those racial classifications that would violate the Equal Protection Clause.'"  *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (quoting *Regents v. Bakke*, 438 U.S. 265, 287 (1978)); *see Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 697 (7th Cir. 2015) ("Racial discrimination by a recipient of federal funds that violates the Equal Protection Clause also violates Title VI.").  The Court will therefore address only Exodus's equal protection claim.  The Court's analysis will begin with whether Exodus has standing to bring this claim and, concluding that it does, will turn next to its merits.

### 1.    Standing

Exodus contends that it has Article III standing because it was injured by the State's conduct, and further, that it has third-party prudential standing to bring an equal protection claim

on behalf of its Syrian refugee clients who are subject to national origin discrimination by the State.  The Court will address each of these distinct standing doctrines in turn.

### a.     Article III Standing

"From Article III's limitation of the judicial power to resolving 'Cases' and 'Controversies'," and the separation-of-powers principles underlying that limitation, [the Supreme Court] ha[s] deduced a set of requirements that together make up the 'irreducible constitutional minimum of standing.'" *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  This constitutional minimum, often referred to as Article III standing, is jurisdictional.  *See Dunnet Bay*, 799 F.3d at 688.  To establish Article III standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citation and quotation marks omitted).

Exodus argues that it has Article III standing because (1) it has been injured, and will continue to be injured, by failing to receive reimbursement from the State for social services it provides its Syrian refugee clients; (2) this injury was directly caused by the State's directive; and (3) the injury will be redressed by a favorable decision.  More specifically, Exodus presents evidence that the State's decision to not reimburse Exodus will have significant repercussions on Exodus's ability to serve the refugee families to whom it is assigned and that, to make up for this lost money, Exodus will have to take away services it provides in other areas to both its Syrian and non-Syrian refugee clients.  (*See* Filing No. 16-1 at 7.)

11

The State does not directly dispute whether Exodus has Article III standing, and it even acknowledges that its conduct "may harm Exodus's economic interests." (Filing No. 41 at 54.) The State does, however, raise one argument regarding prudential standing that touches upon the Court's Article III standing—namely, that there is no injury, or that it is at least hypothetical, because it is unclear whether any Syrian refugees will be assigned to Exodus for resettlement in Indiana.

Although the State argues that Exodus's injury is speculative because it is unclear whether Exodus will be assigned any Syrian refugees for resettlement, the evidence reveals the contrary. First and foremost, Exodus is already providing social services to Syrian refugees.[3]  Moreover, Exodus has been informed by two Volunteer Agencies that it has been assigned to resettle nineteen Syrian refugees "in the next few weeks or months." (Filing No. 16-1 at 6.)  The State attempts to undermine this evidence by pointing out that sometimes these assignments are changed before resettlement occurs; indeed, the nineteen Syrian refugees originally scheduled for resettlement has been reduced to fifteen.  (Filing No. 41-39 at 17.)  But even if only fifteen, rather than nineteen, Syrian refugees are scheduled for resettlement in the near future, this is still sufficient injury in fact.  Moreover, the State has not undermined Exodus's evidence that it is projected to resettle 215 refugees from "North East / South Asia" in 2016, most of whom will be Syrian.  (Filing No. 16-1 at 2.)  The loss of funds for social services Exodus provides its Syrian refugee clients, and will provide in the near future, is an injury to Exodus that is "imminent" rather than "speculative." *Silha*, 807 F.3d at 173.

---

[3] Because Exodus is currently providing Syrian refugees—other than the four refugees resettled in January 2016—social services for which it can seek reimbursement from the FSSA, it is irrelevant that those four refugees are enrolled in the Matching Grant Program and that Exodus will therefore not seek reimbursement for them from the State.

In conclusion, the Court agrees with Exodus that the evidence demonstrates it has Article III standing to bring its equal protection claim. The evidence adduced by Exodus shows that it will be economically harmed by the State's decision to withhold federal funds from Exodus for social services it provides to its Syrian clients. This loss of federal funds is detrimental to the programming Exodus can provide to its clients.

### b.    Prudential Standing

The parties vigorously dispute whether Exodus has prudential standing to bring its equal protection claim. Prudential standing is a "nonconstitutional doctrine, entirely judge-made," which "precludes the federal courts from exercising jurisdiction over some types of case that Article III would not forbid the courts to adjudicate." *MainStreet Organization of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 745 (7th Cir. 2005); *see Dunnet Bay*, 799 F.3d at 689 ("In contrast with constitutional limitations on standing, prudential limitations are not jurisdictional and may be disregarded in certain situations."). This "salutary rule of self-restraint [was] designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig v. Boren*, 429 U.S. 190, 193 (1976).

The prudential standing doctrine is somewhat in tension with the Supreme Court's recent "reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is 'virtually unflagging.'" *Lexmark*, 134 S. Ct. at 1386 (quoting *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013)). Nevertheless, the Supreme Court continues to apply the prudential standing doctrine, which "encompass[es] . . . at least three broad principles: the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected

13

by the law invoked." *Id.* The prudential limitation at issue here, referred to as third-party standing, is the first of these principles—namely, "that a litigant generally must assert his own legal rights and interests and cannot assert the legal rights or interests of third parties." *Dunnet Bay*, 799 F.3d at 689. The third-party standing doctrine "'recognizes that claims are best prosecuted by those who actually have been injured, rather than by someone in their stead.'" *Marin-Garcia v. Holder*, 647 F.3d 666, 670 (7th Cir. 2011) (quoting *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000)).

"Like any general rule, however, this one should not be applied where its underlying justifications are absent." *Singleton v. Wulff*, 428 U.S. 106, 114 (1976). Therefore, the Supreme Court "has looked primarily to two factual elements to determine whether the rule should apply in a particular case." *Id.*; *see Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). First, the Supreme Court looks to:

> the relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit.

*Singleton*, 428 U.S. at 114-15. Part of this analysis includes an examination of whether "the relationship between the litigant and the third party [is] such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Id.* at 115. Second, the Court must examine "the ability of the third party to assert his own right." *Id.* at 115-16.

The State contends that neither of the two factual elements are met here because, as to Syrian refugees that Exodus may resettle in Indiana in the future, "Exodus does not now and may never have relationships with them." (Filing No. 41 at 53.) Further, the State argues that even if

a sufficient relationship exists between Exodus and its future Syrian refugee clients, there is no reason that those individuals cannot bring suit to vindicate their own rights.

Exodus responds that its interests and those of its Syrian refugee clients are closely linked and not at all speculative, as it has produced undisputed evidence that it is already providing social services to Syrian refugees that it has resettled in Indiana, and further, that it will be resettling additional Syrian refugees in Indiana in the very near future and throughout the year.  Moreover, Exodus contends that there are real impediments to Exodus's Syrian refugee clients bringing this suit—namely, that many have limited English-language proficiency and they have a "natural-desire to 'lay low,'" particularly "given that public knowledge of the family's origin may very well provoke the type of fears of terrorist activity noted by the Governor in this case."  (Filing No. 46 at 35.)  Beyond these criteria, Exodus argues that courts have consistently found that a business or organization has standing to raise claims "on behalf of its customers or clients when the challenged actions restrict the clients and thereby injure the business."  (Filing No. 46 at 35.)

The Court agrees with Exodus that the two factual predicates for third-party standing are present in this case.  First, Exodus certainly has a close relationship with its Syrian refugee clients. Its entire purpose and mission is to resettle refugees escaping dire circumstances so that they may establish "self-sufficient lives in freedom and sanctuary for themselves and their families in Indiana."  (Filing No. 16-1 at 2.)  To do so, Exodus uses federal grant funds to provide its clients an entire range of services, including social, medical, and employment.  Exodus seeks to assert its Syrian refugee clients' equal protection rights so that it may continue to receive federal funding to provide social services to those clients, which the State is currently withholding only as to refugees from Syria.

15

This demonstrates that the enjoyment of the Syrian refugee's equal protection rights "is inextricably bound up with the activity [Exodus] wishes to pursue." *Singleton*, 428 U.S. at 114. Put differently, Exodus wishes to receive the funding necessary to provide social services to its Syrian clients, but it is being prevented from doing so by conduct it contends violates those clients' rights under the Equal Protection Clause to not be subject to national origin discrimination. Therefore, the Court's "construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit." *Id.* at 114-15.

The State's argument to the contrary—that Exodus currently has no ongoing relationship with any Syrian refugee clients, and it is uncertain that it ever will—is unsupported by the evidence. As discussed above, Exodus is already providing reimbursable social services to Syrian clients that it previously resettled in Indiana, and it has been assigned to resettle fifteen Syrian refugees in Indiana "in the next few weeks or months." (Filing No. 16-1 at 6.) Exodus undoubtedly has a sufficiently close relationship with these refugees.

These facts distinguish this case from those holding that a sufficiently close relationship did not exist because, for example, the attorney-client relationship invoked regarded future, undetermined clients and was thus "hypothetical" rather than "existing," *Kowalski*, 543 U.S. at 131, or the doctor-patient privilege had ended and would never resume, *see Massey v. Helman*, 196 F.3d 727, 741 (7th Cir. 1999). Unlike in those cases, Exodus has a current, ongoing relationship with specific Syrian refugees it has resettled, or will soon resettle, in Indiana. Given this, and the singularity of interests between Exodus and its Syrian refugee clients, it is clear that Exodus is "fully, or very nearly, as effective a proponent of the right" as its clients. *Singleton*, 428 U.S. at 115.

The second factor that must be evaluated—the ability of Syrian refugees to assert their rights—also favors third-party standing.   This factor presents a relatively low threshold. Hindrances to litigation need not be "insurmountable," *Singleton*, 428 U.S. at 117; it is sufficient that there is merely "*some* hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (emphasis added).

It is clear that Syrian refugees have significant hindrances to bringing this suit on their own. For starters, as Exodus argues, they are newly arrived refugees, escaping political or religious persecution, who quite understandably have a desire to "lay-low" and not draw the attention to themselves that this suit would necessarily bring.   This desire is particularly salient given the attention Syrian refugees generally are receiving from government officials and the media, as the parties' evidence readily demonstrates.[4]   Moreover, Governor Pence publicly stated that he was suspending the resettlement of Syrian refugees in the State.   Although this ultimately did not occur, it is fair to say that Syrian refugees would be reticent to bring this litigation against the Governor in such circumstances.

The foregoing hindrances to bringing this litigation are similar in quality to other hindrances courts have found sufficient to confer third-party standing.  *See Powers*, 499 U.S. at 414-15 (holding that the lack of incentive for jurors excluded from a trial to vindicate their constitutional rights was a sufficient hindrance to warrant third-party standing); *Singleton*, 428 U.S. at 117 (holding that physicians have third-party standing to assert the right of their patients who seek abortions because those women "may be chilled from [an] assertion [of their own rights] by a desire to protect the very privacy of her decision from the publicity of a court suit");

---

[4] This includes coverage of ongoing litigation between other states and the federal government regarding the resettlement of Syrian refugees in those states.  *See, e.g.*, *Alabama v. United States*, No. 2:16-cv-00029-JEO (N.D. Ala. 2015); *Texas Health & Human Servs. Commission v. United States*, No. 3:15-cv-03851-N (N.D. Tex. 2015).

17

*Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir.

2002) (holding that third-party standing was present for an organization to bring claims on behalf

of individuals receiving mental health services because the "stigma associated with receiving

mental health services presents a considerable deterrent to litigation").   Moreover, even if the

foregoing hindrances to bringing this litigation were relatively minor, "when the interests of the

litigant and the third party are closely related," as they undoubtedly are here, "courts have viewed

quite charitably assertions of third-party standing." *Rothner v. City of Chicago*, 929 F.2d 297, 301

(7th Cir. 1991).

　　For these reasons, the two factors necessary to confer third-party standing upon Exodus in

this case are met.   Notably, this conclusion is in accord with several cases in which the Supreme

Court "has allowed standing to litigate the rights of third parties when enforcement of the

challenged restriction *against the litigant* would result indirectly in the violation of third parties'

rights." *Kowalski*, 543 U.S. at 130 (collecting cases).   For example, in *Craig*, the Supreme Court

held that an alcohol vender had third-party standing to bring a constitutional challenge to a statute

governing the sale of beer to males on behalf of its male customers. 429 U.S. at 194.   Specifically,

it concluded that these "vendors and those in like positions have been uniformly permitted to resist

efforts at restricting their operations by acting as advocates of the rights of third parties who seek

access to their market or function." *Id.* at 195.   As in these cases, the enforcement of the State's

directive against Exodus—declining to reimburse it for social services it provides only to Syrian

refugees—indirectly results in the alleged violation of the Syrian refugees' constitutional rights.

　　Finally, the Court's conclusion that Exodus has third-party standing accords with the notion

that the prudential limitation on third-party standing "should not be applied where its underlying

justifications are absent." *Singleton*, 428 U.S. at 114.   As stated above, a primary purpose of the

doctrine is "to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig*, 429 U.S. at 193. Here, however, the contours of the constitutional question are clear: the Court must assess whether it violates the Equal Protection Clause for the State to withhold federal funds from Exodus that it uses to provide social services to Syrian refugees.

Accordingly, Exodus has third-party standing to assert the equal protection rights of its Syrian refugee clients in this case. Not only are the two factual elements necessary to establish third-party standing present, but allowing Exodus to pursue this claim in no way undermines the justifications animating the prudential limit on third-party standing.

### 2. Merits

"The Equal Protection Clause of the Fourteenth Amendment protects individuals from governmental discrimination." *Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013). If the governmental discrimination at issue "classifies by race, alienage, or national origin, [the Court] subject[s] the legislative action to strict scrutiny." *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006); *see Swanson*, 719 F.3d at 783 ("The typical equal protection case involves discrimination by race, national origin or sex."). If the governmental conduct does not "involve a suspect classification, rational-basis review applies." *Indiana Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015).

The parties first dispute what level of scrutiny should apply to the State's conduct. The Court will address this question first, before assessing whether the challenged conduct withstands the proper scrutiny.

a.      **Applicable Level of Scrutiny**

Exodus and the United States both contend that the State's directive discriminates on the basis of national origin and therefore must be subject to strict scrutiny.[5]  The State responds that national origin discrimination, for the purposes of the Equal Protection Clause, is a proxy for discrimination based on race or ethnicity, which are characteristics its directive does not take into account.

The State points to cases in which the term national origin is discussed in terms of ethnicity or ancestry.  *See, e.g.*, *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 93 (1973) (interpreting the term "national origin" in Title VI of the Civil Rights Act, and discussing the term as it relates to ancestry, but not United States citizenship or alienage).  But as Exodus points out, the Supreme Court—in the equal protection context—has equated national origin discrimination to discrimination based on one's nationality.  *See Graham v. Richardson*, 403 U.S. 365, 371 (1965) ("[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny."); *see also Sklar v. Byrne*, 727 F.2d 633, 636 (7th Cir. 1984) (listing "nationality" as a suspect class subject to strict scrutiny).  The State's argument, therefore, that national origin discrimination does not include discrimination based on nationality is directly contrary to the Supreme Court's statement in *Graham* and cases following it.  Moreover, the Supreme Court has held that classifications based on "country of origin" are subject to strict scrutiny, and in so doing discussed "country of origin" in term of both ancestry and nationality. *Oyama v. California*, 332 U.S. 633, 640 (1948) (holding that discrimination "based solely on . . . country of origin" requires a "compelling justification" to overcome an equal protection challenge).

---

[5] Exodus also argues that the State discriminates on the basis of alienage.  Because the Court ultimately concludes that strict scrutiny applies because the State discriminates on the basis of national origin, it need not address alienage.

The foregoing shows that, whether framed as ancestry, nationality, citizenship, or country of origin, national origin discrimination encompasses classifications based on where a person is from or based on specific characteristics that reflect as much.  The fact that the Supreme Court uses different terms when discussing national origin discrimination reflects not, as the State argues, that national origin discrimination includes only discrimination based on one of these discrete categories; it instead reflects that such classifications are examples of ways in which national origin discrimination occurs.

Here, the State's directive, which singles out refugees of Syrian citizenship or those of no citizenship who last resided in Syria, can fairly be described as a classification based on nationality.  But regardless of the precise word used to describe the State's classification, the State's own characterization of it removes any doubt that it discriminates based on national origin.  The State's directive applies to "any refugee who is fleeing Syria," which is determined "by reference to the refugee's country of origin, *i.e.*, the country of the refugee's citizenship or residence whose protection from persecution the refugee is unable or unwilling to seek."  ([Filing No. 41-1 at 2-3](#)) (citing 8 U.S.C. § 1101(a)(42)(A)).  The State's argument based on this definition is essentially that it classifies based on a refugee's "country of origin," not its national origin.  When stated as such, it seems patent that this is a distinction without a difference, as these terms are one in the same.  This is especially true given that the Supreme Court has used "national origin," "nationality," and "country of origin" interchangeably when describing classifications subject to strict scrutiny.  *See Graham*, 403 U.S. at 371; *Oyama*, 332 U.S. at 640.

Finally, even if the State can find a way to parse those terms such that they are not completely overlapping—e.g., "country of origin" includes Syrian citizens *and* non-Syrian citizens who reside in Syria, while national origin includes only Syrian citizens or those of Syrian

descent—the State provides no explanation for why such a distinction matters for the purposes of equal protection analysis.  Although the Supreme Court has not settled on a definitive test for whether a certain classification is subject to heightened scrutiny, it has looked to certain criteria, such as whether the characteristic defining the class is "immutable," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986), and whether the class is politically powerless or has been subjected to a history of discrimination, *see Massachusetts Bd. of Retirement v. Muriga*, 427 U.S. 307, 314 (1976).  For the State's argument to carry any weight, these factors would have to apply more strongly, for example, to a classification based on citizenship or ancestry than to individuals whose "country of origin," as defined by the State, is Syria, such that the former group would constitute a protected class while the latter would not.  The State has not explained how this is so, nor is it clear how it could.

In the end, the State tries to complicate a question that is rather straightforward.  It is treating refugees who originate from Syria differently than those from other countries.  If this is not national origin discrimination, the Court does not know what is.

### b.   Application of Strict Scrutiny

As stated above, classifications based on national origin are subject to strict scrutiny. *Vision Church*, 468 F.3d at 1000.  To survive strict scrutiny, the challenged action "must be narrowly tailored to serve a compelling governmental interest." *Northern Contracting, Inc. v. Illinois*, 473 F.3d 715, 720 (7th Cir. 2007); *see Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 720 (2007).

The State suggests that it has a compelling interest in protecting Indiana residents from the threat of terrorism posed by refugees fleeing Syria.  It presents evidence in the form of, among other things, Congressional reports and testimony from governmental officials regarding the

potential threat posed by individuals seeking to commit acts of terrorism in the United States who pose as Syrian refugees.  For example, the Assistant Director of the FBI's Counterterrorism Division, Michael Steinback, testified before Congress that a concern with conducting background checks for Syrian refugees is "the lack of our footprint on the ground in Syria, [and] that the databases won't have the information we need."  (Filing No. 41-18 at 50.)  And Director of the FBI, James Comey, testified regarding background checks for Syrian refugees, stating that the United States "could only query what [it] ha[s] collected," but that the United States has far less in its databases with respect to Syrian refugees than Iraqi refugees.  (Filing No. 41-19 at 1.)

Exodus presented countervailing evidence.  For example, Exodus submitted the declaration from former Secretary of Homeland Security Janet Napolitano, who attests that all refugees "who have been admitted to the United States have passed through the highest levels of scrutiny from a law enforcement and national security perspective," and that these checks take approximately eighteen to twenty-four months to complete.  (Filing No. 46-1 at 1.)

The parties each assert a series of evidentiary challenges to the others' declarations.  The Court need not delve into these challenges, however, because the Court will assume without deciding that the State has a compelling interest in the safety and security of Indiana citizens.[6] This is because, even if this asserted interest is compelling, the State's response is not "narrowly tailored to serve [that] compelling governmental interest."  *Northern Contracting*, 473 F.3d at 720.

The State argues that its withholding of federal grant monies for Syrian refugees is narrowly tailored because it is a "measured response meant to deter, temporarily, resettlement of

---

[6] The Court notes that it doubtful that the State has carried its burden to "specifically identify an 'actual problem' in need of solving." *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011).  For the most part, the States' evidence is highly generalized and speculative.  There is no evidence, for example, that would allow the Court to conclude that any of the specific Syrian refugees being resettled in Indiana by Exodus create a heightened risk of terrorist activities.  Nevertheless, the Court will *assume* that this showing has been made.  This assumption, as such, should not be viewed in any way as a factual determination that Syrian refugees resettled in Indiana pose any particular level of security risk.

Syrian refugees in Indiana, and to prompt more thoroughgoing engagement between the federal government and the states." (Filing No. 41 at 57.)  More specifically, the State asserts that its directive "is not intended to deter potentially dangerous refugees from wanting to resettle in Indiana; it is aimed at deterring the *resettlement agencies* from bringing potentially dangerous refugees to Indiana." (Filing No. 64 at 10.)

Exodus responds that a narrowly tailored response to the State's purported compelling interest in safety would be to "do something to investigate individuals that prompt this suspicion, rather than create a blanket policy" meant to deter resettlement of all Syrian refugees in Indiana. (Filing No. 46 at 41.)  The United States agrees with Exodus's position, arguing that the withholding of funding for social services for Syrian refugees fails to "advance any interest in public safety," and instead merely harms those refugees without justification.  (Filing No. 58 at 19.)

The State's attempt to further its asserted compelling interest in public safety by withholding federal funds for social services provided to Syrian refugees is a far cry from a means "specifically and narrowly framed to accomplish that purpose."  *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003).  As an initial matter, the record shows that the State's attempt to deter Voluntary Agencies from resettling Syrian refugees in Indiana has been utterly ineffective: several Syrian refugees have been resettled in Indiana since the State's directive, including by Exodus, and the Voluntary Agencies with which Exodus works have informed Exodus that they will continue to assign Syrian refugees to Exodus for resettlement in Indiana.  It is difficult to see how a response could ever be narrowly tailored to achieve a goal when the only evidence before the Court on the matter reveals that the means chosen have not in any way advanced the goal; Syrian refugees have, and will continue to be, resettled in Indiana despite the directive.

But the fact that the State's purported attempt at deterrence is not at all working is merely one reason why the State's directive is not narrowly tailored.  The purpose of the narrow tailoring requirement "is to ensure that the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.* (citation and quotation marks omitted).  The withholding of funds from Exodus that are meant to provide social services to Syrian refugees in no way directly, or even indirectly, promotes the safety of Indiana citizens.  The State's position to the contrary rests upon assumptions about which the evidence is, at best, unclear; specifically, that the withholding of these funds will deter Voluntary Agencies from resettling Syrian refugees here (which, as stated above, the evidence demonstrates is false) and that the specific Syrian refugees who are not resettled here because of that deterrence would pose a security risk (about which the State can only speculate).

Even if the State's desired deterrence was actually created, it would deter Voluntary Agencies from settling *all* Syrian refugees in Indiana, not just those who supposedly pose a security risk.  For example, based upon evidence regarding Syrian refugees who have been or soon will be resettled in Indiana, this includes Syrian children as young as four years old.  It is beyond reasonable argument to contend that a policy that purportedly deters four year olds from resettling in Indiana is narrowly tailored to serve the State's asserted interest in public safety.  Simply put, the State's directive, even if it was effective, is dramatically over-inclusive and thus not narrowly tailored.

Related to the foregoing problems is the focus of the State's directive.  The State deprives Syrian refugees that are already in Indiana of social services in the hopes that it will deter Voluntary Agencies from resettling *other* Syrian refugees in the State.  This is essentially a policy of punishing Syrian refugees already in Indiana in the hopes that no more will come.  As stated

25

above, such a course does nothing to alleviate the alleged threat caused by the Syrian refugees that are already in Indiana, who, assuming they pose a security risk (which has not been proved), by their mere presence would pose a much greater one than Syrian refugees who have not yet settled here.  It is difficult to see how a narrowly tailored response could include only the deterrence of future security risks, without at all addressing present ones.

The State implicitly confronts this problem by arguing that its method of deterrence is the State's only option given its limited authority to act in the immigration arena, but that does not mean its response is narrowly tailored.  There is no requirement that every governmental classification can be sufficiently narrowly tailored such that it will overcome strict scrutiny.  After all, the Supreme Court has observed that governmental conduct is "rarely . . . sustained in the face of strict scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984).

To the extent the State argues that the fact that its directive is "temporary" helps show that it is narrowly tailored, the Court disagrees.  The State has unsurprisingly cited no legal authority for the proposition that temporary national origin discrimination is any more constitutionally acceptable than permanent discrimination.  Moreover, when questioned at the hearing about the purported temporary nature of the State's directive, the State was unable to give even a loose timeframe for when the directive may change.

In sum, the evidence before the Court reveals that the means the State has chosen to accomplish its objectives do not at all further the State's asserted interest in safety.  And even if there was evidence that the State's directive created the desired deterrence on Voluntary Agencies from settling Syrian refugees here, this falls well short of the "specifically and narrowly framed," *Grutter*, 539 U.S. at 333, response the law requires to overcome strict scrutiny. The State's directive is entirely unresponsive to the Syrians already here, and sweeps too broadly with the

26

Syrian refugees it seeks to deter from coming.  Therefore, the State's objective and the means it has employed to accomplish that objective fail to fit "so closely that there is little or no possibility that the motive for the classification was illegitimate . . . ." *Id.*

Having failed to survive strict scrutiny by a wide margin, there is a strong likelihood that the State's withholding of federal funds that Exodus uses to provide Syrian refugees with social services violates the Equal Protection Clause.  Notably, the Court would reach the same conclusion even if the State's directive should be subject to rational-basis review instead of strict scrutiny.  Applying rational-basis review, Exodus has shown that the State's "difference in treatment is not rationally related to a legitimate state interest." *Cook*, 808 F.3d at 322.  For the reasons stated, the State's legitimate interest in safety has in no way been furthered by its treatment of Syrian refugees differently than others.  Syrian refugees continue to be resettled in Indiana, and there is no evidence that the State's goal of deterrence has had any effect.  Accordingly, Exodus has a strong likelihood of success on the merits regardless of the level of scrutiny applied to the State's directive.

**B.     Irreparable Harm**

The Court, having determined that Exodus has a strong likelihood of success on its equal protection claim, must address the remaining preliminary injunction factors, beginning with irreparable harm.  To prove this factor, Exodus must show "that it is likely to suffer irreparable harm in the absence of preliminary relief." *Grace Schools*, 801 F.3d at 795.

Exodus argues that it has demonstrated irreparable harm for two reasons.  First, Exodus contends that constitutional violations are presumed to cause irreparable harm.  Notably, the State does not respond to this argument.  Second, Exodus argues that the failure to receive the funding to which it is entitled will frustrate its organizational mission, as Exodus cannot afford to compensate for the money lost without severe damage to its ability to provide for the refugee

families it serves.  The Court need not address Exodus's second argument, as the first is sufficient for Exodus to carry its burden to establish irreparable harm.

Exodus is correct that "for some kinds of constitutional violations, irreparable harm is presumed."  *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).  The Seventh Circuit has explicitly held that this presumption applies when one's First or Second Amendment rights are violated.  *See id.*  Several judges in this district, including the undersigned, have concluded that this presumption also applies to equal protection violations.  *See, e.g.*, *Baskin v. Bogan*, 983 F.Supp.2d 1021, 1028 (S.D. Ind. 2014); *Planned Parenthood of Indiana and Kentucky v. Commissioner, Indiana State Dep't of Health*, 984 F. Supp. 2d 912, 930 (S.D. Ind. 2013); *L.P. v. Commissioner, Indiana State Dep't of Health*, 2011 WL 255807, *4 (S.D. Ind. 2011).

The same conclusion is warranted here, as the basis for holding that violations of one's First and Second Amendment rights constitute irreparable harm apply equally to equal protection violations.  As explained by the Seventh Circuit, "[t]he loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future."  *Ezell*, 651 F.3d at 699.  The same is true of the loss of Second Amendment rights, which "protect[] similarly intangible and unquantifiable interests."  *Id.*  If the Second Amendment right to possess a firearm for protection is "intangible and unquantifiable," certainly the right to not be subject to unconstitutional discrimination by the government is as well.  *Cf. Back v. Carter*, 933 F. Supp. 738, 754 (N.D. Ind. 1996) ("[E]qual protection rights are so fundamental to our society that any violation of those rights causes irreparable harm.").

28

Moreover, when the Seventh Circuit has concluded that a constitutional violation does not cause irreparable harm, it is because the violation can be rectified by an award of damages.  For example, a Fourth Amendment violation stemming from an illegal search or seizure does not presumptively cause irreparable harm because it is a "constitutional tort" analogous to a "personal-injury" claim where money damages will be awarded.  *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004).  Unlike Fourth Amendment violations that are akin to personal injury claims, the harm from unconstitutional discrimination is "intangible and unquantifiable," as governmental discrimination has consequences well beyond those that money could ever rectify.

Even if irreparable harm was not presumed, Exodus has still carried its burden on this factor.  Although the funding denied to Exodus could ultimately be reimbursed, Exodus has presented evidence that, in the interim, its organizational objectives would be irreparably damaged by its inability to provide adequate social services to its clients.  This, in the alternative, provides another basis to conclude that Exodus has made the necessary showing on this fact.

In sum, Exodus has shown a strong likelihood of success that the State's challenged conduct constitutes unconstitutional discrimination in violation of the Equal Protection Clause.  Such an ongoing constitutional violation constitutes irreparable harm.  *See Preston v. Thompson,* 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm.").

## C.   Balance of Harms

The third preliminary injunction factor requires Exodus to demonstrate "that the balance of equities tips in its favor."  *Grace Schools*, 801 F.3d at 795.  "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the

more it must weigh in his favor." *Turnell*, 796 F.3d at 662. "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller*, 695 F.3d at 678 (citation and internal quotation marks omitted).

Exodus's position regarding the balance of harms is straightforward: Exodus will suffer irreparable harm as well as financial and organizational harm, and the State, as a governmental entity, cannot claim that being required to comply with the Constitution is harmful. The State addresses the balance of harms and the public interest factors together, and focuses almost entirely on the public interest factor. To the extent the State addresses the balance of harms, it contends that Exodus is not suffering organizational harm, as it is continuing to resettle Syrians in Indiana, and Exodus nor its clients are suffering financial harm because, as is the case for the four Syrian refugees Exodus resettled in January 2016, the Matching Grant Program functions as an alternative source for any funds Exodus may lose.

As an initial matter, Exodus has made a strong showing that it is likely to succeed on the merits of its equal protection claim. Therefore, the balance of harms need not strongly weigh in Exodus's favor for this factor to be met. Exodus has certainly met this relatively low threshold. Exodus has demonstrated irreparable harm for the reasons discussed above. Further, Exodus has presented evidence that the State's withholding of federal funds from Exodus will have significant repercussions on Exodus's ability to serve the refugee families to whom it is assigned. It will cause Exodus to forgo services it provides to refugees in other areas, which will strain its ability to serve not only its Syrian refugees, but all its refugee clients.

The State's attempts to downplay these harms are unavailing. First, as to financial harm, the State essentially argues that there is none since Exodus can simply utilize the Matching Grant

Program.  But the preliminary injunction Exodus seeks is about more than the four Syrian refugees

resettled in January 2016; it is also about the nearly two-hundred Syrian refugees it will settle here

in 2016.  "Injunctions issue to curtail palpable risks of future injury; it is not essential to establish

that the worst has come to pass."  *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir.

2006).  Exodus therefore need not wait until the State denies reimbursement for social services it

provides utilizing the federal grant funds that pass through the FSSA.  It is undisputed that Exodus

will resettle Syrian refugees here in the imminent future that are eligible to receive social services

using these funds, and, as the Court has concluded, it is likely that the denial of these funds by the

State violates the Equal Protection Clause.  There is a "palpable risk[] of future injury" to Exodus,

and that is all the showing that is required.  *Id.*

     Second, as to organizational harm, this stems from Exodus's inability to provide all of the

services it believes necessary to adequately transition its clients to life in Indiana.  The fact that

Exodus continues to resettle Syrians here does not diminish the harm the impending financial

consequences of the State's directive places on Exodus's ability to fulfill its organizational

mission.

     The State has presented essentially no evidence that granting Exodus a preliminary

injunction will cause countervailing harms.  This is perhaps because it is difficult to conceive of

how an injunction requiring it to comply with the Constitution could be harmful.  *See Christian*

*Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) ("[I]f [a state university] is applying

[a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the state

university's] claimed harm is no harm at all.").  To the extent the State contends that the potential

harm stems from the risk Syrian refugees purportedly pose to the safety of Indiana residents, as

discussed at length above, the State's withholding of funds for social services to Syrian refugees

does not directly or indirectly address this concern. Syrian refugees have been and will continue to be resettled in Indiana despite the State's directive, which shows that, even if the purported safety risks were a legitimate harm, whether or not the State continues to pass on federal money to Exodus for social services it provides Syrian refugees does not implicate that concern.

The State also suggests that refugees have no particular stake in settling in Indiana, thus neither Exodus nor any refugees will be harmed if the State's directive remains in place. Presumably, this argument is premised on the fact that Voluntary Agencies will not assign Syrian refugees to Exodus for resettlement in Indiana, since it is those agencies, not the refugees, that determine where refugees will be resettled. The evidence reveals that this premise is false. But even if the Voluntary Agencies were deterred from resettling Syrian refugees in Indiana because the State's conduct has a detrimental effect on the social services Exodus could provide its refugees, such a state of affairs would directly harm Exodus's organizational mission to assist in the resettlement of any and all refugees.

The most notable feature of the State's position in this case is that it says its directive is justified because it is meant to deter the resettlement of Syrian refugees in Indiana by harming Exodus's ability to provide those refugees with social services. Yet at the same time the State argues there is no harm to Exodus or its refugee clients. The State cannot have it both ways.

The only way the State could conceivably have it both ways is if the Voluntary Agencies decide to not settle *any* Syrian refugees in Indiana through Exodus. But, again, the evidence shows that this has not occurred, nor will it in the future.

In sum, Exodus, and the refugees it serves, will suffer real harm absent a preliminary injunction in this case, and the State will suffer none. Accordingly, Exodus has shown that the balance of harms weighs in its favor.

D.     **Public Interest**

The fourth and final preliminary injunction factor requires Exodus to show "that issuing an injunction is in the public interest."  *Grace Schools*, 801 F.3d at 795.  Exodus argues that it is always in the public interest for the State to follow federal law, especially when there are no adequate remedies available.

The State responds that the federal government is violating its responsibility under the Refugee Act to "consult regularly" with Indiana and take its views into consideration before placing refugees in the state.  *See* 8 U.S.C. § 1522(a)(2)(A), (D).  Therefore, the State says that its directive "is part of a larger effort not only to deter resettlement of Syrian refugees without better background checks, but also to persuade the United States to consult more seriously with the States." (Filing No. 41 at 63.)  In short, the States says it is in the public interest to allow the State to proceed with its course of action, as it is part of a "high-stakes policy negotiation between the State and the United States . . . , which weighs heavily against an injunction that would tie the Governor's hands." (Filing No. 41 at 63.)

Beginning with the State's position, the Court agrees with Exodus that, "even assuming that [the State's goal of forcing the federal government into a policy negotiation] is a legitimate purpose," the State "does not explain how punishing Exodus and injuring its refugee-clients further this purpose." (Filing No. 46 at 44 n.22.)  The State essentially argues that it is in the public interest for the Court to allow unconstitutional discrimination to continue during the pendency of this litigation—discrimination that harms both Exodus and its clients—so that it can gain perceived leverage in its dispute with the federal government over immigration policy and whether the federal government is complying with its obligations under the Refugee Act.

The Court could hardly disagree more with the State's position.  The public interest is served when constitutional rights are vindicated.  *See Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("Surely, upholding constitutional rights serves the public interest.") (quoting *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).  This does not change simply because the State believes a non-party is failing to comply with federal law.  Indeed, the Court has difficulty seeing how a party (the State) could ever demonstrate that it was not in the public interest to enjoin an ongoing constitutional violation because that party wished to use the conduct causing the constitutional violation as leverage in a dispute with a non-party (the United States).  But regardless of whether this would ever be appropriate, the State has certainly not demonstrated that it is here.

Accordingly, the public interest is served by enjoining ongoing unconstitutional discrimination by the State against Syrian refugees who are resettling in Indiana.  *See Preston*, 589 F.2d at 303 n.3 ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.").

## IV.   <u>CONCLUSION</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 20.  Exodus has demonstrated that it is likely to succeed on the merits of its equal protection claim.  The State's conduct clearly constitutes national origin discrimination.  Although the State says it has a compelling reason for doing so—the safety of Indiana residents—the withholding of federal funds from Exodus that it would use to provide social services (such as cultural integration training, job skills training and adult English language training) to Syrian refugees in no way furthers the State's

asserted interest in the safety of Indiana residents.  In balancing the competing claims of injury, it is clear that Exodus and its refugee clients will be harmed by the State's directive.  When this is weighed against the near complete absence of harm to the State, it is clear that equity demands a preliminary injunction to issue.

Accordingly, Exodus's Motion for Preliminary Injunction is **GRANTED**.  (Filing No. 6.) Pursuant to Federal Rule of Civil Procedure 65(d), the Court **ISSUES A PRELIMINARY INJUNCTION** prohibiting the State from taking any actions to interfere with or attempt to deter the resettlement of Syrian refugees by Exodus in the State of Indiana, including by withholding from Exodus funds and services due Exodus and the refugees it serves.  Because the State has not disputed Exodus's position that the State will not incur monetary damages from this injunction, Exodus need not post a bond.

Date: 2/29/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Judy Rabinovitz
ACLU FOUNDATION
jrabinovitz@aclu.org

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Cecilia D. Wang
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
cwang@aclu.org

Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
ojadwat@aclu.org

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

Jonathan R. Sichtermann
INDIANA ATTORNEY GENERAL
jonathan.sichtermann@atg.in.gov

Lara K. Langeneckert
INDIANA ATTORNEY GENERAL
lara.langeneckert@atg.in.gov

Heather Hagan McVeigh
OFFICE OF THE ATTORNEY GENERAL
heather.mcveigh@atg.in.gov

Patricia Orloff Erdmann
OFFICE OF THE ATTORNEY GENERAL
Patricia.Erdmann@atg.in.gov

Thomas M. Fisher
OFFICE OF THE ATTORNEY GENERAL
tom.fisher@atg.in.gov

James C. Luh
U.S. DEPARTMENT OF JUSTICE
james.luh@usdoj.gov

SHORT APPENDIX 36